AVAILABLE AT THE PUBLIC TERMINAL FOR VIEWING ONLY

U. S. Bankruptcy Court
MIDDLE DISTRICT OF TENNESSEE (Nashville)
Adversary Proceeding #3:13-ap-90400


*Plaintiff:*

MarketGraphics Research Group, Inc.,
357 Riverside Drive, Suite 210
Franklin, TN   37064


*Defendant:*

David Peter Berge, David Berge
1345 Bell Road
Antioch, TN   37013



**TRANSCRIPT OF PROCEEDINGS**
**March 31, 2016**
**Before The Honorable Marian F. Harrison, Bankruptcy Judge**



APPEARANCES

Counsel for the Plaintiff:

        EUGENE N. BULSO, JR., ESQ.
        PAUL JOSEPH KROG, ESQ.
        414 Union Street, Suite 1740
        Nashville, TN   37219
        615-780-4115


Counsel for the Defendant:

        STEVEN L. LEFKOVITZ, ESQ.
        618 Church Street, Suite 410
        Nashville, TN   37219
        615-256-8300
_____

*ANN WOOFTER, Certified Court Reporter*
*2220 Golden Oak Place*
*Madison, Tennessee   37115*
*615-868-8800*

```
1                              INDEX

2    WITNESS                 DIRECT  CROSS  REDIR  RECR  COURT

3    David Berge               10     79

4    Donald Berge              81

5    Paula Charles            111    128    129

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Be seated, please.  Go ahead

 2    and call the case.

 3                    CLERK:  David Berge, Adversary 13-90400.

 4                    THE COURT:  All right, anyone want to

 5    make a statement or just put on witnesses?

 6                    MR. KROG:  Your Honor, we're prepared to

 7    make a brief opening statement.

 8                    THE COURT:  Okay.

 9                    MR. KROG:  We can waive that if you'd

10    like.  We did have, Your Honor, a motion to seal certain

11    trial exhibits.  I don't think you'd object to that.

12                    MR. LEFKOVITZ:  No.

13                    THE COURT:  Okay.

14                    MR. KROG:  Thank you, Your Honor.  Paul

15    Krog -

16                    THE COURT:  I think all of them have been

17    uploaded, haven't they?  Did you tell me all of them had been

18    -

19                    MR. KROG:  There are some voluminous

20    ones, Your Honor, that I have tried in the past to submit by

21    that system and they simply do not have.

22                    THE COURT:  I was just thinking about

23    your seal thing.  Go ahead.

24                    MR. KROG:  Then I'd move into evidence

25    the stipulated exhibits, and in addition to -
```

3

```
 1                    THE COURT:  Which are?  Which ones?

 2                    MR. KROG:  Many of them, actually, Your

 3   Honor.

 4                    THE COURT:  Do you have it to present to

 5   me so that I can see it?

 6                    MR. KROG:  I do, Your Honor.  Most of

 7   them have been pre-marked and then Mr. Lefkovitz has agreed

 8   to stipulate several of the ones that we submitted, not

 9   marked but stipulated.  I'll give this list to Your Honor.

10                    THE COURT:  All right.

11                    MR. KROG:  If I may approach.

12                    THE COURT:  You may.  So, the ones with

13   an X have been stipulated; is that right?

14                    MR. KROG:  Yes, Your Honor.  And I

15   believe, according to the stipulation we filed, also Exhibit

16   52, which is one of the voluminous exhibits that wouldn't go

17   by the ECF System would qualify.  That was the Realysis Q2

18   Book (phonetic).

19                    THE COURT:  That's stipulated, too?

20                    MR. KROG:  Yes, Your Honor.

21                    THE COURT:  Okay.  Make your statement.

22                    MR. KROG:  If I could have the screen,

23   please.  Your Honor, this is a case under 523(A)(6) regarding

24   the effects of an effort to (inaudible - glitch on disc)

25   clients in violation of Code against competition.  That
```

                                                                    4

1   effort had two players, Mr. David Berge and Mr. Donald Berge.

2   And the Court will hear from both of them today.  And between

3   their testimony and the exhibits, Your Honor, might hear some

4   conflicts between their versions of how this effort went.  I

5   believe that's the Defendant's main theory of the case.

6                   The Defendant says that his father was

7   driving the bus and his father had, at one point, said that

8   David was driving the bus.  It's our position that the Court

9   need not resolve that conflict because the testimony and the

10  evidence will show that the Defendant, the younger Mr. Berge,

11  knew he was on the bus.

12                  As I mentioned, this is a 523(A)(6) case.

13  As the Court knows, that means we have these two elements

14  that are laid out in the statute, willful and malicious.  And

15  the willful standard is that the thing is intentional.  You

16  desire the consequences of your act or you know them to be

17  substantially certain to result.  And the Sixth Circuit made

18  it very clear that this is the test that is developing from

19  the restatement in the Markowitz Case, which we looked at

20  previously.  In the language from its holding down here

21  towards the end of the Opinion, based on the Supreme Court's

22  (inaudible) and he quotes the second restatement of tort,

23  Section 8(A), the actor desires to cause consequences of this

24  act or the (inaudible) consequences are substantially certain

25  to result from it.  And it's a disjunctive test.  You don't

1  have to desire the consequences and you don't have to know

2  they're going to result.  Either problem with that suffices.

3  And that's how the restatement itself plays it out.  Comments

4  make that very clear.  And that's how other courts treating

5  intentional torts view the topic of intent that's the law in

6  Tennessee, for instance.

7

8                    Then there's malicious.  And malicious

9  isn't ill will, spite, depraved heart.  That just means that

10  you've acted in conscious disregard of your duties, of

11  someone else's rights, or without just cause or excuse.  And

12  that language, that test, is from the older Wheeler versus

13  Lardoni case, and they cited a long body of case law when

14  they adopted that test.  But that case, the test, even the

15  part of Wheeler has been overruled by Geiger, this test

16  survives and we've seen the Bankruptcy Appellate Panel cited

17  much more recently in 2012 in the Cunningham Case.  Here they

18  are cited to the Wheeler standard before.  And that's a

19  standard that is essentially analogous to what's the

20  (inaudible) in most circuits, most courts around the country.

21                    You don't have to be a criminal

22  mastermind for your conduct to qualify as malicious

23  infliction of injury.  We can discuss later the cases.  You

24  just have to participate in the undertaking and know what

25  you're doing, know who the undertaking is harmful - if your

6

1   participation rises to the standard of conscious disregard or

2   being without just cause or excuse, and undertaking as a

3   whole is injurious and you know that, well the fact that

4   you're in there following somebody else's lead, that won't

5   get you off the hook.

6             I was reading recently the old color

7   karate book Pinnochio to my children and most of us know the

8   Disney version from the 40's.  And end of the book and the

9   movie, they get on the wagon to Funland.  They don't drive

10  the wagon; they don't operate Funland.  But they get there

11  and they know where they're going and they know they're

12  supposed to be in school, and at least in the book, they both

13  wind up jackasses.  And without any intent to use the term as

14  a derogatory aspersion, I think what we'll see here is

15  somewhat similar, that Mr. Berge knew he was driving this

16  Realisis business, he knew he had driven somewhere else.

17  Thank you, Your Honor.

18            MR. LEFKOVITZ:  Your Honor, Steve

19  Lefkovitz for the Defendant, and I'll be very, very brief.

20  The argument that Mr. Krog just made is the same argument

21  that he made prior to Your Honor's exhaustive ruling on

22  September 30, 2014 when he entered a motion for summary

23  judgment.

24            He went on to argue that Judge Trauger's

25  Order found both willful and malicious.  His argument was the

1   same then as it is today.  The proof, if you look at this

2   exhaustive proof, you would think that Donald Berge is the

3   Defendant in this case and we are in the United States

4   Bankruptcy Court for the Northern District of Mississippi in

5   Aberdeen.  No, we are here in Nashville and we're still in

6   Nashville, and we are trying the case of David Berge.

7                        Now, Your Honor, has ruled in a

8   memorandum opinion that the issue that needs to be decided is

9   not whether or not there is a willful violation but did David

10  Berge act maliciously.  Now, we're going to hear tremendous

11  proof about what Don Berge did and that is the issue that's

12  at the (inaudible) of the proof.

13                       If you look at all their witness list,

14  emails from Don, Don to, communications with Don, Don to.

15  And what they have regarding David Berge is a Facebook Page

16  and a LinkIn Profile.  That is not malicious and the case

17  should be dismissed and Mr. Berge should get his (inaudible).

18                       THE COURT:  Call your first witness.  You

19  don't want the rule?

20                       MR. KROG:  I would like the rule.

21                       MR. LEFKOVITZ:  I want the rule.

22                       THE COURT:  Any witnesses other than the

23  one he's getting ready to call need to step outside and sit

24  on the bench out there.

25                       MR. KROG:  The only other witness we

8

1    have other than the two Messrs. Berge is Ms. Paula

2    (inaudible) who is (inaudible).

3                       MR. LEFKOVITZ:  Mr. Warlick was on your

4    witness list, did he get excused?

5                       MR. KROG:  Mr. Warlick has been excused.

6                       MR. LEFKOVITZ:  All right, thank you.

7                       MR. KROG:  Your Honor, the Plaintiff

8    calls Mr. David Berge.

9                       (Witness sworn)

10                      CLERK:  State your name for the record,

11   please.

12                      THE WITNESS:  David Peter Berge.

13                      MR. LEFKOVITZ:  As a preliminary matter,

14   Your Honor, right before the commencement of this case –

15                      THE COURT:  Speak into the microphone.

16                      MR. LEFKOVITZ:  I'm sorry, Your Honor, I

17   thought this one was picking me up.

18                      Your Honor, Steve Lefkovitz for the

19   Defendant.  Right before the commencement of this case – I

20   just want to call it to the Court's attention – I saw Mr.

21   Berge taking a pill.  I asked him a few minutes ago what that

22   pill was for and he said it was an anti-anxiety pill.  But I

23   did want the Court to be aware that he did take medication

24   before he was offering testimony today, in case the Court of

25   Appeals – and maybe he could explain what the medicine was.

9

```
 1    I just noticed it and I wanted to call it to the Court's

 2    attention.

 3                      THE COURT:  Mr. Berge, what pill did you

 4    take?

 5                      THE WITNESS:  Xanax.

 6                      THE COURT:  And are you sure that you can

 7    give full and fair testimony today, even with the Xanax

 8    onboard?

 9                      THE WITNESS:  Yes.

10                      THE COURT:  I had a Xanax when I had an

11    MRI because I'm claustrophobic and it put me to sleep.  So,

12    do you take Xanax regularly?

13                      THE WITNESS:  Yes.

14                      MR. LEFKOVITZ:  What was the milligrams

15    of that Xanax, Mr. Berge?

16                      THE WITNESS:  One milligram.

17                      THE COURT:  And you don't think that's

18    going to impair any of your answers today?

19                      THE WITNESS:  No.

20                      THE COURT:  Go ahead.

21    THEREUPON came

22            D A V I D   P E T E R   B E R G E

23    who, having been first duly sworn according to law, testified

24    as follows:

25                      **DIRECT EXAMINATION**
```

10

```
 1   BY MR. KROG:

 2              Q    Where do you live, Mr. Berge?

 3              A    I currently have moved back into my

 4   parents' house, 135 Lawler Road (phonetic) in Hernando,

 5   Mississippi.

 6              Q    You're a college graduate, aren't you,

 7   Mr. Berge?

 8              A    Yes.

 9              Q    Rhodes College?

10              A    Yes.

11              Q    What year did you graduate?

12              A    2001.

13              Q    Your father operated between 1997 and

14   2012 a business under the name of MarketGraphics of Memphis,

15   did he not?

16              A    Yes.

17              Q    And to clarify, your father is Mr. Donald

18   Berge?

19              A    Yes.

20              Q    And you worked with your father's

21   MarketGraphics of Memphis business from its inception in

22   1997, correct?

23              A    Yes, off and on, over the course of 15

24   years.

25              Q    Your father operated that
```

11

1    business pursuant to a license or associate agreement with

2    MarketGraphics of Memphis, correct?

3              A    I believe it was called an associate

4    agreement.

5              Q    And my question was - let me restate the

6    question.  Your father operated MarketGraphics of Memphis

7    pursuant to an associate agreement with MarketGraphics

8    Research Group or MarketGraphics National, correct?

9              A    Yes.

10             Q    And that was a housing market research

11   business, correct?

12             A    Correct.

13             Q    You and your father collected housing

14   market data and delivered it to MarketGraphics here in

15   Nashville and MarketGraphics produced a report based on the

16   data, correct?

17             A    Correct.

18             Q    You did what they call drive the market

19   for MarketGraphics of Memphis, correct?

20             A    Yes; my father and me, and sometimes when

21   I was in college I didn't do it, and there were other

22   occasions within the 15 years where I had another job that

23   kept me from doing the drive.

24             Q    With the exception of a few odd cycles

25   where you weren't able to participate, you participated

1   in driving the market during this period, correct?

2                   A      Correct.

3                   THE COURT:  What does it mean by driving

4   the market?  I don't understand that.  Are you going to ask

5   that?

6                   MR. KROG:  I can ask it or he can answer

7   the question from Your Honor.

8                   THE COURT:  Yes, answer it.

9                   THE WITNESS:  Well, to drive the market,

10  we go through every fourth month and go through all of the

11  active subdivisions and the active subdivisions in our

12  database.  We count the starts and closings, and based on

13  those starts and closings, it's entered into a database that

14  formulates a report, and bankers can utilize that report to

15  decide whether or not a subdivision is a good investment.

16  Like if a builder comes to X Bank and says I want a

17  construction lot on three lots in a subdivision, they will

18  turn around a look at the data to decide whether or not that

19  construction loan is a good idea.  So, we basically, every

20  four months just refresh the data and based on the previous

21  data you can tell the growth, what areas are growing and what

22  subdivisions are successful, what subdivisions have been

23  overbuilt and things like that.

24                  THE COURT:  Let me ask Mr. Lefkovitz a

25  question.  Mr. Lefkovitz, you've been around your

                                                              13

1    client quite a bit; is that right?

2                    MR. LEFKOVITZ:  Yes, Your Honor.

3                    THE COURT:  Does he sound like he's

4    playing with a full deck today?

5                    MR. LEFKOVITZ:  Yes, Your Honor.  I think

6    he's doing fine.

7                    THE COURT:  I don't know, I've never

8    heard him before.  He sounded kind of sleepy to me.  But go

9    ahead.

10                    THE WITNESS:  I am sleepy.  I got about

11   four hours.

12                    THE COURT:  That's not a problem.

13                    MR. LEFKOVITZ:  If I were walking into a

14   trial, I would be up all night before.

15   BY MR. KROG:

16           Q    And to clarify, Mr. Berge, counting the

17   starts and the progress on these audits that you drove the

18   market, those would be construction of new homes, how many

19   new homes had been started, what the progress was on those

20   new homes and subdivisions?

21           A    Yes.

22           Q    And you did that in Shelby County and the

23   surrounding counties in Memphis?

24           A    It was mainly just DeSoto County and

25   Shelby County, so two out of five counties.

14

1    Q    If you would please look behind you, Mr.

2  Berge, there is a box of binders and I believe one of those

3  binders should have a little sticky note with the No. 2 on

4  it.  I'll ask you to turn to Tab 30 in that binder, Mr.

5  Berge.

6          A    MG 18?

7          Q    Yes.  And Mr. Berge, when you drove the

8  market as we've been talking about, you used 11 x 17 MG area

9  maps to do that, didn't you?

10         A    Yes.

11         Q    You carried these in the car with you?

12         A    Yes.

13         Q    And the map we're looking at here, MG 18,

14  that is essentially identical to the map you would have used

15  to drive that market in a given year, correct?

16         A    That's correct.  The things that would

17  change would be subdivisions dropping off or being added.

18  But, other than that, the boundaries are the same.

19         Q    And the subdivisions are marked on this

20  map with little (inaudible) rectangles, aren't they?

21         A    Yes.

22         Q    Now, if you would look further in Tab 30,

23  you will see there are the maps for the other DeSoto County

24  and Shelby County MGA is on there; is that Shelby County and

25  DeSoto County?

                                                      15

1          A     Right, yes.

 2          Q     When you drove the market in 2007, you

 3    use these maps in the car, correct?

 4          A     That's correct.

 5          Q     How long, Mr. Berge, did you spend in a

 6    car each day with these maps when you were driving the

 7    market?

 8          A     It varied.  As we got closer to the data

 9    that needed to be done, sometimes I would crunch and I would,

10    you know, do 12+ hours, but I typically like to keep it to

11    about 8 to 10 hours.  After while it started to drain on me

12    and I'd get headaches and stuff like that.

13          Q     And how long did it take you to complete

14    the audit for a given report cycle?

15          A     Approximately three weeks.

16          Q     Now, Mr. Berge, if you'll turn to Tab 31

17    in the binder, Exhibit 31, these are the same maps for 2008,

18    aren't they?

19          A     (Pause).

20          Q     The tabs are sort of buried in between

21    the maps because the maps are longer than the tab pages.

22          A     I'm not seeing these tabs.

23                MR. KROG:  May I approach, Your Honor?

24                THE COURT:  You may.

25    BY MR. KROG:

1       Q    Mr. Berge, the question was whether these

2  2008 maps are the same maps you would have used when you

3  drove the market in 2008?

4       A    Yes.  The boundaries of the area are the

5  same but, once again, over time subdivisions get added and

6  they get dropped.  They get dropped after they're completed,

7  meaning the last house that's been built finally has an

8  occupant, then we take it off the database.

9       Q    I'm not asking you about the locations of

10  the subdivisions so –

11       A    Do you want the boundaries?

12       Q    The fact that you used these 11 x 17 maps

13  to drive each time you drove in 2008.

14       A    That's correct.

15       Q    And you believe them to be the recent

16  maps because otherwise, as you noted, the subdivisions would

17  be in the wrong place, right?

18       A    Can you repeat that?

19       Q    Sure.  When you drove the market you

20  needed to use the map that had come out most recently

21  because, otherwise, the subdivisions would not be in the

22  correct places on the map?

23       A    Usually that's correct but as the market

24  slowed there weren't many subdivisions being added or deleted

25  so sometimes I would use the same map that had been out from

1   the first report all the way through the end of the year.

2   So, we'd use the same map for three months, the three audit

3   periods.

4           Q       The witness completely passed Exhibit 32.

5           A       (Inaudible).

6           Q       I just have the same question about

7   Exhibit 32.  Is Exhibit 32 a collection of the maps you used

8   to drive the market in 2009?

9           A       Yes, it's the same answer as I gave

10  before.

11          MR. KROG:  Could the witness please be

12  passed Exhibit 33?

13  BY MR. KROG:

14          Q       And I just have the same questions, Mr.

15  Berge, about this exhibit, a compilation of maps that you

16  used to drive in 2010.

17          A       Same answer.

18          Q       And if Exhibits 34 and 35 are the same

19  maps from the years 2011 and 2012, your answer would be the

20  same, correct?

21          A       Correct.

22          MR. KROG:  And could the witness be

23  passed Exhibits 34 and 35?

24  BY MR. KROG:

25          Q       And those are respectively the

18

1    11 x 17 maps you used in those years?

    2                    A    That's correct.

    3                    Q    You know what a copyright is, don't you,

    4    Mr. Berge?

    5                    A    I don't know technically but I've got a

    6    good idea.

    7                    Q    Well, you know, Mr. Berge, that copyright

    8    means that the thing being copyrighted is somebody's

    9    intellectual property, correct?

   10                    A    Correct.

   11                    Q    And you know that the law prohibits

   12    people from copying other people's copyrighted things,

   13    correct?

   14                    A    Correct.

   15                    Q    You knew that back when you were driving

   16    the market for MarketGraphics in Memphis, correct?

   17                    A    Well, it's kind of confusing because I

   18    knew my dad created the initial boundaries in '88 and he was

   19    working as MarketGraphics of Memphis.  So, there's a little

   20    bit of confusion when it came to –

   21                    Q    I didn't ask you about what happened in

   22    1988 or who created the boundaries, did I?

   23                    A    I guess not.  If you could repeat the

   24    question.

   25                    Q    Mr. Berge, you knew between 2007 and

                                                                        19

```
 1   2012 that it was unlawful to copy somebody else's copyrighted

 2   material, correct?

 3                  A      Right.  I had nothing to do with the

 4   creation of those maps.

 5                  Q      Mr. Berge, each one of these maps we've

 6   looked at has the copyright legend in the lower right-hand

 7   corner, doesn't it?

 8                  A      Yeah, at the very bottom, MarketGraphics

 9   Research Group, Incorporated, 2009.

10                  Q      And the ones we saw for 2007, 2008, 2010,

11   2011 and 2012 have the corresponding legend, didn't they, Mr.

12   Berge?

13                  A      Yes, I'm assuming so.

14                  Q      Feel free to go back through them and

15   look at them one-by-one.

16                  A      Yes.

17                  Q      The record will reflect that they were

18   there.

19                  A      Okay.

20                  Q      And these are the maps, Mr. Berge, that

21   you spent eight to 12 hours with in a car for three weeks at

22   a time, three times a year for these years, correct?

23                  A      For a total of nine weeks a year,

24   correct.

25                  Q      And you looked at these maps while
```

20

1  you were driving?

2         A    Yes, I did.

3         Q    And of all that time you saw on one of

4  these maps, if not every last one, this copyright legend,

5  didn't you, Mr. Berge?

6         A    You know, to be honest, I never really

7  paid attention to it.  I never really thought about it

8  because, like I said, my father created boundaries.  We were

9  collecting the data.  He was working under the name of

10 MarketGraphics in Memphis.  I just really wasn't that

11 observant, to be honest.

12        Q    Mr. Berge, again, I think you're

13 answering a slightly different question.  You can't sit here

14 and tell the Court that at no time between 2007 and 2012 did

15 you see the legend on these maps, "Copyright MarketGraphics

16 Research Group, Inc," can you?

17        A    Not for certain, no.

18        Q    In fact, you would say it's more likely

19 than not that you did see that legend, at least some of the

20 time.

21        A    Possibly.

22        Q    It's more than possible, isn't it, Mr.

23 Berge, you looked at the maps eight to 12 hours a day for

24 nine weeks out of the year –

25        A    I didn't focus on the lower right

21

1    corner, I was focused on the map of the subdivision.

2          Q    Mr. Berge, you knew in August or

3    September 2012 that your father was going to quit working

4    with MarketGraphics Research Group and do essentially the

5    same business under the name Realysis of Memphis, correct?

6          A    Yes.

7          Q    In fact, you had already (inaudible) on

8    the market for Realysis of Memphis before your father

9    requested to terminate his associate agreement with

10   MarketGraphics, hadn't you?

11         A    That's correct.  There was an overlap but

12   it wasn't for a report, it was for a thumb drive and he

13   didn't charge for it.  He just gave it in addition to for the

14   MarketGraphics clients.

15         Q    Well, Mr. Berge, that's not entirely

16   accurate, is it?

17         A    I don't know what you mean.

18         Q    If you would turn behind you and get the

19   binder that is marked one.  I apologize for sitting that one

20   on the ledge there.  Hope you don't knock it off.  And if

21   you'll turn to Tab 9 and flip to – if you'll look at the

22   corner of these documents, they have page I.D. numbers.

23   Please flip to Page I. D. Number 437.

24              Mr. Berge, I apologize, I'm having you

25   look at the wrong exhibit.  If you'll please turn to

22

1    Page I.D. 449.

2                    A    Invoice?

3                    Q    Yes.   This invoice is dated September 24,

4    2012, isn't it, Mr. Berge, right under the word "invoice"?

5                    A    That's correct.

6                    Q    And this invoice is for the quarters that

7    are included with the Q2 printed report, correct?

8                    A    Our second report coming out, is that

9    what you mean?

10                   Q    Well, I just asked you if it says Q2

11   2012.   And if you look in the binder behind you again, I

12   believe you will find the Q2 2012 Realysis report.

13                   A    In the binder right here?

14                   Q    In the box.

15                   A    What did you want me to look for?

16                   Q    The Realysis binder.   That binder is

17   marked Exhibit 52, is it not?

18                   A    Yes.

19                   Q    And the invoice, looking at the screen,

20   is marked Page I.D. 449 and we have Exhibit 9.   This one is

21   the invoice for the binder that is in Exhibit 52, correct?

22                   A    Yes.

23                   Q    And the invoice came out after the binder

24   did, correct?

25                   A    That's correct.

23

```
 1                    THE COURT:   The binder what?

 2                    MR. KROG:   Exhibit 52, Your Honor.

 3                    THE COURT:   Thank you.

 4    BY MR. KROG:

 5           Q     And your father didn't email

 6    MarketGraphics Research Group to ask to terminate the

 7    associate agreement until four days after this invoice was

 8    printed, did he, Mr. Berge?

 9           A     Would you repeat the question?

10           Q     Sure.   Your father didn't email

11    MarketGraphics Research Group to request termination of the

12    associate agreement until four days after this invoice was

13    printed, did he?

14           A     I don't know when he sent that, did the

15    termination letter.   I had nothing to do with the operation

16    of the business so I don't know.

17           Q     If you would look at Exhibit 39, Mr.

18    Berge, which should be in the two binder.

19           A     I'm sorry, two binder what?

20           Q     Tab 39.

21           A     I've got it.

22           Q     And that email from September 28, 2012

23    your father sent requesting to terminate the associate

24    agreement, isn't it?

25           A     It appears to be so, yes.
```

                                                                 24

1          Q     So this email actually came out before

2    your father told MarketGraphics that he wanted to terminate

3    their relationship, didn't it?

4          A     Did it appear so, yes.

5          Q     So you actually did drive the market for

6    a printed Realysis book before your father requested to

7    terminate MarketGraphics of Memphis, didn't you?

8          A     Apparently so, but I didn't realize that

9    at the time.

10         Q     Well, that's not true, is it, Mr. Berge,

11   because of the areas were different, weren't they?

12         A     Yeah, but I didn't know when he sent the

13   termination letter.  I didn't have anything to do with the

14   creation of that.

15         Q     You knew you were using different maps to

16   drive the market, didn't you, Mr. Berge?

17         A     The Realysis maps, correct.

18         Q     And some of those areas in Memphis are

19   different than MarketGraphics areas, aren't they?

20         A     Yes, because, as a city grows and they

21   annex, boundaries change and boundaries are modified.  He

22   took steps to update the boundaries.

23         Q     And you didn't think when you were

24   driving with Realysis maps that you were driving with the

25   MarketGraphics maps, did you?

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 25 of 170 PageID #: 1760

```
1                A    No.

2                Q    We just looked at that September 28, 2012

3    email and your father actually told you he was going to send

4    that, didn't he, before he did it?

5                A    No, no, he didn't tell me when he was

6    going to send it or what.  I didn't know what had occurred.

7    I knew he had plans to terminate but I had never read this

8    letter or knew when he sent it.

9                Q    Mr. Berge, I didn't ask you if you had

10   read the email, did I?

11               A    No, you didn't.

12               Q    I asked if you knew your father was going

13   to terminate, which you did know that –

14               A    You asked me if I knew that he was going

15   to send this letter and the answer to that is no, I did not.

16               Q    You didn't know that your father was

17   going to send that specific email.

18               A    Right.

19               Q    But you knew your father was going to

20   contact MarketGraphics and terminate his associate agreement,

21   request to terminate it, and that he was going to continue

22   doing Market Research business under this name Realysis of

23   Memphis.

24               A    Yeah, I would hear about this stuff after

25   the fact, after he would do stuff.  I mean I didn't live in
```

26

1   Memphis, I lived in Nashville.  I mean we didn't have daily

2   conversations about this time.  Sometimes it would be weekly

3   and sometimes not even that.  I mean the audit took me three

4   weeks, and as soon as I was done, I had to drive back to

5   Nashville to do construction audit inspections the first week

6   of every month.  And our discussion of Realysis and

7   MarketGraphics was very, very limited.  So, it's not like I

8   was in Memphis working with him on a daily basis, I wasn't.

9   I was an independent contractor and I only worked nine weeks

10  and this wasn't my baby.  I'd been -

11            Q    Mr. Berge, your father told you before he

12  sent that letter that he was going to terminate, didn't he?

13            A    Yes.

14            Q    He told you at least far enough in

15  advance for you to drive the market with the Realysis maps,

16  didn't he?

17            A    I don't recall when he told me.  I didn't

18  ask questions.

19            Q    And you continued to work with your

20  father's market research business after he switched over to

21  being Realysis of Memphis, correct?

22            A    That's correct.  It was still three weeks

23  at a time, three times a year up to a quarterly.  So an

24  additional fourth.

25            Q    You did more than just drive the

                                                          27

1   market for Realysis Memphis, didn't you, Mr. Berge?

2          A    That was the bulk of it.  I also went to

3   public websites where plat approvals were recorded so that we

4   could figure out if there were any new subdivisions on the

5   horizon.

6          Q    That was called pipeline research?

7          A    Well, pipeline was actually one step even

8   farther back.  That's when tracts of lands are rezoned to

9   residential and that gets put in the database as well.

10         Q    And you did pipeline research for

11  Realysis, didn't you?

12         A    I did part of it.  I did the research for

13  two out of the five counties.

14         Q    And you helped hold the MLS data for the

15  price information that was put into the (inaudible), correct?

16         A    That's correct.

17         Q    And you did between 90 and 100 percent of

18  the data entry for Realysis, didn't you?  You went out and

19  drove and then you typed it all into the computer so it could

20  go into the book?

21         A    Well, starting off like when I was in

22  college and stuff like that.

23         Q    Mr. Berge, I didn't ask you about what

24  you did in college, I asked you what you did for Realysis.

25         A    Oh, for Realysis.  Yeah, I probably

1  did 90 percent.  My dad would help me sometimes if we were

2  behind schedule or something.

3                Q     And there was one occasion you generated

4  the Realysis Memphis invoices, didn't you?

5                A     Yes.

6                Q     You even had a desk at your parents'

7  house that was your desk where you did these things, didn't

8  you?

9                A     That's correct.  I didn't have

10  MarketGraphics or Realysis material at my Nashville house.

11  All the materials were kept with my father.

12                Q     So you came and you had your desk there

13  and you did the research and you drove the market and you

14  came home and you put it into the computer, and then you went

15  back home?

16                A     Yes, sir.

17                Q     If you'll look back at Exhibit 52, Mr.

18  Berge —

19                THE COURT:  Let's take a three-minute

20  break.

21                MR. KROG:  Yes, Your Honor.

22                     (Brief recess)

23                CLERK:  All rise.

24                THE COURT:  Be seated, please.

25  BY MR. KROG:

1          Q    Going back to Exhibit 52, Mr. Berge,

2    that's the Realysis Q2 report, there's not much in here, Mr.

3    Berge, other than the data you collected, is there, apart

4    from some introductory letter material?

5          A    You mean the bar graphs and stuff like

6    that?

7          Q    Well, the bar graphs and the tables, all

8    they did was present the data you collected in the last

9    pipeline research and out on the drive, correct?

10         A    Yes, a portion.  Like I said, I did two

11   out of the five counties; my dad did the three others.

12         Q    And the maps depict the locations of

13   subdivisions, correct?

14         A    Correct.

15         Q    And you input the GPS coordinants for the

16   subdivision so they can plot it on the map, correct?

17         A    That's correct.  My father and I both did

18   that.

19         Q    Realysis of Memphis, Mr. Berge, was an

20   LLC in the State of Tennessee, wasn't it?

21         A    Yes.

22         Q    And you were the sole member and officer

23   of Realysis of Memphis, LLC, weren't you?

24         A    Yes.  I found out that after the fact, my

25   father set me up as a registered agent.  I didn't know about

30

1   that and I guess he appointed me sole member and I didn't

2   find out about that until after the fact as well.

3            Q     You didn't object when you found out

4   about it, did you?

5            A     Well, it was after the fact.

6            Q     In fact, when you filed your Bankruptcy

7   Petition, Mr. Berge, with this court, you actually listed

8   that you were doing business as Realysis of Memphis, didn't

9   you?

10           A     Yes.  I can't remember who was helping me

11  with that when I filled out my Bankruptcy.  Someone must have

12  told me to do that.

13           Q     And this Realysis Report that we looked

14  at in Exhibit 52 wasn't the only report, the only addition to

15  this report that Realysis of Memphis put out, was it?

16           A     No.

17           Q     In fact, Realysis put out several more,

18  even after MarketGraphics had filed suit against them in

19  January of 2013, didn't it?

20           A     Yes, up until the preliminary injunction.

21           Q     And if you look at Exhibit 67, Mr. Berge

22  –

23           A     Is that in Binder 2 or –

24           Q     That should be in Binder 2.

25           A     Sixty-seven?

1          Q    Yes, Mr. Berge.  Those are excerpts,
2     aren't they, Mr. Berge, from the Q3 2012 Realysis of Memphis
3     Report, aren't they?
4          A    Right.
5          Q    And they would have been part of a book
6     just like the Q2 that's marked with Exhibit 52?
7          A    Yes.
8          Q    And if we look at Exhibit 69, that's the
9     Q4 2012 report or excerpts from it, correct?
10         A    That's correct.
11         Q    And it also came out in binder form like
12    Q2?
13         A    Yes.
14         Q    And these reports that Realysis put out,
15    they were similar to the reports that MarketGraphics put out,
16    weren't they?
17         A    Yes.
18         Q    You knew that clients in this area
19    weren't likely to get the Realysis Report and MarketGraphics
20    Report, didn't you, Mr. Berge?
21         A    Well, I said they are similar but it
22    should be noted that I never read the MarketGraphics Reports
23    and honestly I've never read the Realysis Reports.  The only
24    reason I would reach into these reports was to actually get
25    the maps.  But based on the preliminary injunction that

                                                              32

1   I witnessed, I would assume, yes, they are similar.

2              Q    Well, your attorney actually admitted

3   during that hearing that they were similar, didn't he?

4              A    Yes.

5              Q    And you knew what was in the

6   MarketGraphics Report, even if you didn't look at it, didn't

7   you, Mr. Berge?  You were out there driving –

8              A    You don't know exactly what's in a report

9   if you don't look at it.

10             Q    You collected a large portion of the data

11  that went into the report, didn't you, Mr. Berge?

12             A    Right.

13             Q    When you were working for Realysis of

14  Memphis, you were paid by the report cycle, correct?

15             A    That's correct.

16             Q    You were paid between $6000 and $10,000 a

17  report cycle?

18             A    Yes.  It varied between that.  Well,

19  actually, I didn't receive compensation but once I was out on

20  my own, yes, I got paid between six and $10,000.

21             Q    And that was the same that Realysis of

22  Memphis paid, correct?

23             A    That's correct.

24             Q    And where within that range your

25  compensation fell depended upon how many clients the

1    business had, didn't it?

2               A     Yeah.  My father and I didn't have a set

3    contract or anything.  We never discussed the money, we never

4    argued over it.  He decided what he wanted to pay me and that

5    was it.

6               Q     But the better the business was doing,

7    the more you got paid, right?

8               A     Yes.  I would assume so.

9               Q     Well, it makes sense, doesn't it?

10              A     Yes.

11              Q     More likely –

12              A     I just didn't have access to his

13   financials so I – actually, most of the time I didn't even

14   know how many clients he had.  But, yes, that's a safe

15   assumption.

16              Q     More likely than not?

17              A     Sure.

18              Q     And your father would tell you when

19   things were going poorly, wouldn't he?

20              A     Poorly?  He actually held off on that for

21   quite a bit.  It kind of took me by surprise because, you

22   know, the market took a dip around 2008 and he had been

23   struggling, losing clients for a while before he told me.  I

24   was surprised because he didn't really curtail my payments,

25   so when he finally told me that his business wasn't doing

34

1  that well and he was, you know, had only been breaking even

2  for a couple years, it actually came as a surprise to me.

3           Q    But as Realysis of Memphis, the better

4  that business did the more you would get paid, right?

5           A    Yes.

6           Q    And you mentioned this before but just to

7  recapitulate, MarketGraphics puts out three reports a year,

8  correct?  And so you got paid three times a year?

9           A    That's correct.

10          Q    The $6000 to $10,000 range?

11          A    Yes.

12          Q    Your father, for Realysis of Memphis, was

13 doing four reports a year, correct, came out quarterly?

14          A    That's right.

15          Q    And you were still paid by the report

16 cycle?

17          A    I don't know if the payment went down for

18 doing the fourth one or not.  He couldn't afford to pay me in

19 bulk so he would just pay me as — first, he would give the

20 report to the clients and then he had to wait on the

21 invoices.  So, he couldn't pay me right after I had done the

22 update.  It was spread out and he kept track of it.  I didn't

23 really —

24          Q    Well, Mr. Berge, you testified during

25 your deposition that you were paid — I asked, "How much did

35

1   you get paid by MarketGraphics Memphis?"  You said,

2   "MarketGraphics of Memphis varied.  I mean you're talking 15

3   years and depending on my parents' financial situation, how

4   the market was doing –

5              THE COURT:  You need to speak into the

6   microphone or I'm afraid we're not going to get a good

7   record.

8              MR. KROG:  I apologize, Your Honor.  That

9   makes perfect sense.

10  BY MR. KROG:

11             Q    And you said it varied between $6000 and

12  $10,000 in the update period.  And then you say, "It depended

13  on how the market was doing."  "Which market are we talking

14  about?"  "Talking about the Memphis market and how many

15  clients he had, how successful he was."  Question:  "How did

16  you get paid by Realysis of Memphis?"  Answer:  "It didn't

17  change.  It was still based on me coming to do those

18  updates."  Question:  "And what determined how much money you

19  actually got from Realysis of Memphis?"  Answer:  "Same deal.

20  What he could afford, how many clients he had.  If he had

21  lost some it still varied within that six to 10 range."

22             Q    You knew – that was truthful testimony

23  when you gave it, wasn't it, Mr. Berge?

24             A    Yes.

25             Q    You knew in the fall of 2012 that you

36

1 and your father didn't have MarketGraphics' permission to

2 operate a different market research business, didn't you?

3          A     Yes.  I was aware of the non-compete;

4 however, I never read it or signed it but I was aware of a

5 non-compete that my father kept telling me was invalid

6 because there was no time limit on there and that there was

7 no configuration.  So I kind of disregarded it.  I mean I

8 trusted what my father said and I can only make decisions

9 based on the information I'm getting.

10          Q     Mr. Berge, you could have gone out and

11 done your own investigation, couldn't you have?

12          A     Yes, I guess.

13          Q     You could have asked him to give you a

14 copy of the associate agreement, couldn't you have?

15          A     I could have.

16          Q     And you never did?

17          A     That's correct.

18          Q     And you never asked any attorney that you

19 consulted prior to the fall of 2012 whether your father's

20 non-compete was enforceable, did you?

21          A     No, I did not.

22          Q     You didn't ask in the fall or winter of

23 2012 when you were starting Realysis of Memphis, you didn't

24 ask any attorney, "Please look at this non-compete and tell

25 me whether or not it's enforceable.  Here's a description

37

1   of what we're doing."

2                    A     Right, I didn't ask that.

3                    Q     In fact, you knew in September of 2012 or

4   the first days of October of that year that you were likely

5   to get sued by MarketGraphics for what you were doing, didn't

6   you?

7                    A     I knew that might be a possibility.

8                    Q     And it was in that context of receiving

9   what you thought was a threatening letter from Mr. Edsel

10  Charles that your father told you that you didn't have

11  anything to worry about if you didn't sign the agreement,

12  right?

13                   A     Right.  He, basically, said, you know,

14  I've talked to attorneys; it's vague; there's no term limit;

15  there's no consideration; you have nothing to worry about.

16  On my side maybe I was naïve.  I didn't think I was doing

17  anything wrong because I'd never signed the agreement so I

18  didn't know.

19                   Q     Have you reviewed the deposition that

20  your father gave in December of last year in your case

21  against Mr. Warlick?

22                   A     Yes, it was on video.  Is that the one

23  you're talking about?

24                   Q     No.  Are you referring to the deposition

25  that was taken at my firm's office in May of 2015?

38

```
 1              A    Yes.

 2              Q    You watched the video of that deposition?

 3              A    Yes.

 4              Q    You're aware that you and your father

 5   have filed a lawsuit against the attorney who represented you

 6   in the case by MarketGraphics, correct?

 7              A    Yes.

 8              Q    You're aware that your father was deposed

 9   in that case in December?

10              A    Oh, yeah, back in Memphis, yes.

11              Q    And you were told that the attorney for

12   Mr. Warlick asked your father, told him that the non-compete

13   was unenforceable?

14              A    No, I didn't read that deposition nor did

15   I see it or discuss it with my father.

16              Q    Did you ever ask your father exactly who

17   told him that?

18              A    No.

19              Q    Do you agree that people should follow

20   the agreements they sign, don't you, Mr. Berge?

21              A    Sure.

22              Q    And if you sign a contract saying one

23   thing and then you do something else, that's dishonest?

24              A    Yes.

25              Q    Your father didn't follow the
```

39

1   agreement he had with MarketGraphics, did he?

2               A    No.

3               Q    And you knew in October of 2012 that what

4   he was doing was breaking that agreement, didn't you?

5               A    Well, like I said before, I dismissed it

6   because the information I was getting was that it wasn't

7   valid and it wouldn't hold up in court.  So, at the time, no,

8   I didn't know that he was technically doing anything wrong.

9               Q    Mr. Berge, you'll agree, won't you, that

10  there's a difference between doing something you've agreed

11  not to do and doing something for which you can be punished?

12              MR. LEFKOVITZ:  Your Honor, I think

13  that's been asked and answered.

14              THE COURT:  He's talking about a contract

15  violation by his father.  I don't see where this is getting

16  you anywhere on malice.

17  BY MR. KROG:

18              Q    One of the reasons that you and your

19  father thought that everything would be hunky-dory, so to

20  speak, with Realysis of Memphis, was that everything for

21  Realysis of Memphis was going to be done in your name, isn't

22  it, Mr. Berge?

23              A    No, I didn't have these conversations

24  with my father.  Like I said, the transition from

25  MarketGraphics to Realysis was very limited between me and my

40

```
1   father.  I lived nine months in Nashville.  I didn't care to
2   talk about it with him and I told him, you know, if this is
3   the move you're going to make that's, fine but – I'll help
4   you do the market updates but other than that I really don't
5   want to be a part of it.
6               Q    Well, you knew you were a bigger part of
7   it than that, didn't you, Mr. Berge?
8               A    I mean doing updates nine weeks out of
9   the year, I don't consider that to be a big part of the
10  business.  I mean –
11              Q    Well, Mr. Berge, you knew that your role
12  in the business was more than that, didn't you?
13              A    Yes.  But if I didn't it he could have
14  gotten somebody else to do the updates.  It's not rocket
15  science.  It's just driving through subdivisions and counting
16  houses.
17              Q    But your father didn't get someone else
18  to do it, did he?
19              A    Yes, he did, on multiple occasions.
20              Q    He didn't get somebody else instead of
21  you?
22              A    If I couldn't do it, yeah, he did.
23              Q    During the Realysis of Memphis period –
24              A    Not during the Realysis period, no.
25              Q    Nobody else helped your father with
```

41

1   the Realysis of Memphis business, did they?

2            A    Well, I mean the computer guy helped a

3   whole lot.  He created the software.

4            Q    No one else did the things that you were

5   doing?

6            A    Right.  My father was doing – it was just

7   me and my father, correct.

8            Q    And your father told you before the

9   lawsuit that you didn't have to worry about the non-compete,

10  didn't he, Mr. Berge?

11           A    Yeah, I was told that by him multiple

12  times.

13           Q    The only attorney who told you that, Mr.

14  Berge, was Mr. Warlick, after the lawsuit was filed, wasn't

15  it?

16           A    Well, Jack Turner, he got Jack Turner's

17  advice but I didn't get that directly from him.  It was

18  hearsay through my father.

19           Q    Didn't you tell us, Mr. Berge, that you

20  didn't ask any attorneys whether or not what you all were

21  going to be doing would breach the non-compete?

22           A    Say that again.

23           Q    Didn't you tell us, Mr. Berge, that you

24  didn't ask any attorney whether what you were doing was

25  permissible?

42

1          A     That's correct.  All the information I
2    got was through my father.
3          Q     And if you hadn't been involved at all in
4    your father's Realysis business or in the Realysis business,
5    you - there wouldn't have been a reason for you to worry or
6    not worry, would there have been?
7          A     Would you repeat that?
8          Q     You don't care one way or another whether
9    your mother has a non-compete provision in her agreement with
10   the school system, do you?
11         A     No.
12         Q     Your mother is a teacher?
13         A     Right.
14         Q     But you don't have anything at all to do
15   with your mother's employment, do you?
16         A     No.
17         Q     So it wouldn't make any sense to you to
18   have a discussion about whether or not you had to worry about
19   the terms of her agreement, would it?
20         A     That's correct.
21         Q     Now, the Realysis of Memphis bank account
22   was actually under your name, wasn't it, Mr. Berge?  It was
23   part of your accounts at First Tennessee?
24         A     Well, I found out after the deposition,
25   actually, that when I accessed my checking accounts at

43

1    Tennessee it used the same password and you could see my

2    father's checking accounts as well.  And there was one that

3    said Realysis.com, and I just assumed that was the Realysis

4    account.  Come to find out, after asking my father about it,

5    the Realysis account that he used was at Bank Plus, which I

6    had no access to.

7              Q    Well, it's true, isn't it, Mr. Berge,

8    there was a Realysis of Memphis bank account that was under

9    your password at First Tennessee, wasn't it, and you knew

10   that at the time of your deposition, didn't you, because you

11   told us about it?

12             A    That's correct.

13             Q    "Did you ever have the password for

14   Realysis of Memphis's online banking interface?"  Answer:  "I

15   did because my two checking accounts were within the same

16   password."

17             A    Right, I said that.  And like I just said

18   before, I was mistaken on that.  That wasn't the actual

19   Realysis account that was getting the money from the clients.

20   I didn't know that at the time.  I never saw the money coming

21   into Realysis.  I had no idea how much it was or anything

22   like that.  I didn't deal with the operations.

23             Q    Turn to Exhibit 53, please, Mr. Berge.

24             A    In two?

25             Q    Fifty-three is in two.

44

1           A     I have 52 and 53 with a blank in between.

2           Q     Is there nothing behind Tab 53 in your

3    binder, Mr. Berge?

4           A     Yeah, 53 is First Tennessee Bank

5    transactions.

6           Q     And this is the Realysis of Memphis Bank

7    Account ledger that you produced in discovery in this case,

8    isn't it, Mr. Berge?

9           A     Yes.  My dad produced it for me but -

10          Q     Mr. Berge, this is the checking account

11   that you can get to from your online banking password, isn't

12   it?

13          A     I believe so, yes.

14          Q     And it's not the same as the Realysis.com

15   bank account, is it, Mr. Berge?

16          A     Apparently not.  I only use my two

17   personal accounts.  I never open my father's accounts.  I

18   mean I wasn't going to go delving into his business.

19          Q     You name was on just about everything

20   Realysis of Memphis put out as its Owner and President,

21   wasn't it, Mr. Berge?

22          A     Yes. I found that out through the facts,

23   yes.

24          Q     Well, you knew at the time that it was on

25   the Realysis Memphis website, didn't you?

45

```
 1              A    I did.

 2              Q    And that it listed you as Owner and

 3    President?

 4              A    Owner I'm not sure but President, yes.

 5    It may have said I was owner as well; I didn't create the

 6    website.

 7              Q    Only that there was an address with your

 8    name being used to send emails from Realysis of Memphis?

 9              A    Yes, my dad created Don@Realysis,

10    David@Realysis and Berge@Realysis.  He did that without my

11    knowledge and I didn't know how to access Realysis.com.  I

12    didn't have a password or anything.

13              Q    You knew that they were being used to

14    send emails that appeared to come from you, didn't you?

15              A    I only knew about the verification letter

16    that came out at the very beginning.  I was not aware to the

17    extent that he was using my name at the bottom.

18              Q    You never asked him to stop doing that,

19    did you, Mr. Berge?

20              A    No, because I wasn't aware of it.

21              Q    Well, Mr. Berge, you knew that he was

22    doing it at least some, weren't you, Mr. Berge?

23              A    Once I knew.  And that was something I

24    actually read.

25              Q    You didn't inquire as to whether or
```

```
 1   not he was doing it more often, did you?

 2              A    Like I said, I wasn't aware of it.

 3              Q    You didn't inquire as to whether he was

 4   doing it more often, did you, Mr. Berge?

 5              A    No, I did not.

 6              Q    You didn't say anything to the effect of,

 7   Dad, I'm not good with that idea.

 8              A    I wasn't aware that it was happening.

 9              Q    You were aware that the invoices that

10   went out in your name, weren't you, Mr. Berge?

11              A    Yes, I believe so.

12              Q    You held yourself out as the President of

13   Realysis Memphis, didn't you, Mr. Berge?

14              A    I held myself out?

15              Q    Yes.

16              A    Yeah, on my Facebook page and Linked In.

17   But it ended up just being a superficial title.

18              Q    Well, if you look at Exhibit 68, Mr.

19   Berge, that's your Linked In page as it appeared in early

20   2013, isn't it?

21              A    Yes.

22                   MR. KROG:  Your Honor, I would move

23   Exhibit 68 into evidence.

24                   MR. LEFKOVITZ:  No objection.

25                   THE COURT:  It will be admitted.
```

47

```
 1                    (Exhibit 68 admitted)

 2  BY MR. KROG:

 3              Q    And you will admit, Mr. Berge, that your

 4  father didn't create this Linked In page, did he?

 5              A    That's correct.

 6              Q    And you'll admit that Owner/President

 7  Realysis Memphis, LLC is a somewhat strange name for someone

 8  who's just an independent contractor, shows up every once in

 9  a while, does some grunt work to put on his Linked In page?

10              A    Yes.  The intention was that my father

11  was going to phase himself out over the course of I don't

12  know how long.  That didn't really occur though because the

13  preliminary injunction pretty much stopped it.  So, yes, over

14  the course of the years I probably would have taken up a more

15  of a role but –

16              Q    That was part of the plan here, wasn't

17  it, Mr. Berge, that you would have – he would form Realysis

18  of Memphis and you would work with him and that you would

19  assume greater visibility and, as you said, take it over

20  someday.

21              A    Yes, that was his plan and that was his

22  wishes.  And he took steps to try and get me more involved.

23  It just so happened I was hesitant to move into that role.

24              Q    And you actually did increase your

25  participation and visibility in the Realysis
```

48

1 Memphis business, didn't you, Mr. Berge?

2          A    Yes, when the first report came out my

3 father asked if I would come with him to hand-deliver I think

4 it was about four or five to some bank clients that were

5 close to his house in DeSoto.  He asked if I would just come

6 with him and do a meet and greet.

7          Q    And you did that?

8          A    Yes, for about four or five clients out

9 of 20-something.

10          Q    You knew who the other clients were, even

11 the ones you didn't meet, didn't you, Mr. Berge?

12          A    No.

13          Q    You knew that your - you knew that the

14 business provided research services to banks and appraisers

15 and other similar people in the Memphis area, didn't you?

16          A    I knew the average number of clients but

17 I didn't know them on a personal level.

18          Q    I didn't ask you if you knew the

19 individual people, Mr. Berge, who worked for the client

20 businesses, but you knew who the clients, in a corporate

21 sense, were, didn't you?

22          A    Like the bank name?

23          Q    Yes.

24          A    No.

25          Q    Well, Mr. Berge, you did the invoices

1 at least once for the MarketGraphics of Memphis and Realysis

2 of Memphis, didn't you?

3            A    That's correct.

4            Q    And you put the client names on there –

5            A    I put the names on there, yes, but I

6 didn't submit it to memory.

7            Q    I didn't ask you if you'd submitted it to

8 memory, Mr. Berge. And you admit, Mr. Berge, that when you

9 were sued by MarketGraphics Research Group that you and your

10 father defended that lawsuit largely on the basis that your

11 father had retired and it was your business, didn't you?

12            A    I had nothing to do with the defense. I

13 never spoke to Warlick until meeting him approximately 30

14 minutes before the preliminary injunction. Other than that,

15 I've never spoken to him at all.

16            Q    Did you not attend a meeting with your

17 father and Mr. Warlick approximately 10 days before the

18 preliminary injunction hearing?

19            A    No, I did not.

20            Q    Mr. Berge, I'm going to ask you to look

21 at Exhibit 2.

22            A    Are we still in Binder two?

23            Q    Exhibit 2 is in Binder one. They go in

24 order, one to 71. Exhibits 1 through 13 are in Binder one.

25            A    Exhibit 2.

1    Q Mr. Berge, that's the entry you filed in

2 the District Court case filed by MarketGraphics, isn't it?

3    A This is what my father did with Warlick.

4    Q Mr. Berge, this answer was filed on your

5 behalf, wasn't it, by your attorney?  Don't you see your

6 name, Mr. Berge?

7    A I see my name on there.  It was filed on

8 my behalf but I didn't have anything to do with it.

9    Q If you'll turn, Mr. Berge –

10    A (Inaudible) Warlick should have tried

11 them separately but I wasn't paying attention.

12    Q Mr. Berge, if we turn to Page 7 of this

13 document.

14    A Page 7?

15    Q Yes.  Paragraph 60.

16    A All right.

17    Q And do we see in Paragraph 60 that the

18 answer that was filed on your behalf affirmatively states

19 that the Realysis Reports produced by David Berge are very

20 different from the MarketGraphics Reports?

21    A Uh-huh.

22    Q If we look at Exhibit 6, Mr. Berge – we

23 look at Page 4 of Exhibit 6.  Doesn't this response to a

24 motion for summary injunction that was filed on your behalf

25 in this case say that your father has retired –

51

```
1            A     We're on Page 4?

2            Q     Page 4 (Inaudible).

3            A     Okay.

4            Q     It says that your father has retired –

5            A     Where is this?

6            Q     I apologize.  The last paragraph,

7   beginning "In summary."

8            A     Okay.  Warlick sent this –

9            Q     Back to the first page, Mr. Berge.

10           A     Okay.

11           Q     Do you see, "Defendant's Response To

12  Motion For Preliminary Injunction," filed on your behalf?

13           A     Uh-huh.

14           Q     And then on Page 4 it says that your

15  father has retired and that the remaining family members are

16  operating the business independently of him.

17           A     I see that, yes.  Warlick and my father

18  collaborated on this.  I had nothing to do with this.

19           Q     Well, Mr. Berge –

20           A     I don't agree with (inaudible).

21           Q     Would you look at Exhibit 27, actually

22  before we switch binders, go to Exhibit 9, Mr. Berge.  Page

23  I.D. 376.  Page 377, actually, please.  And if we see on Line

24  6 of this transcript of your father's deposition, you'll see

25  that your father identifies you as the CEO, don't we?
```

52

1          A     Uh-huh.

2          Q     And you watched the video of this

3    deposition after it was taken, didn't you, Mr. Berge?

4          A     Yes.

5          Q     Before the preliminary injunction?

6          A     Yes.

7          Q     And you never asked your father to

8    correct the statements that he made in that deposition, did

9    you?  And, in fact, he makes similar statements multiple

10   times in this deposition, doesn't he?  And we could go

11   through all of them.

12         A     Yeah, it was on video.  It was a couple

13   hours long.  I didn't take in all that information.

14         Q     Well, none of it fazed you, Mr. Berge,

15   did it, because you knew that this was the story that you

16   were in charge, he had retired and that was how you were

17   going to get away with this?  That's what you knew to be the

18   story, didn't you?  I mean that's why you didn't react to it,

19   isn't it, Mr. Berge?  Because you knew that's what he was

20   saying, what he was going to say?

21         A     I don't recall this coming up and I just

22   wasn't involved in this.  I mean –

23         Q     You never told Mr. Warlick to correct the

24   statements that your father made, did you?

25         A     No, I did not because I never spoke

53

1   to Warlick.

2            Q     Well, you could have spoken to him,

3   couldn't you have?

4            A     Yeah, I could have picked up the phone

5   but I mean –

6            Q     You were at the preliminary injunction

7   hearing, weren't you, Mr. Berge?

8            A     Uh-huh.

9            Q     And if we were to flip to Exhibit 10 and

10  go to Page 1169, Line 24 –

11           A     We're in Exhibit 10?

12           Q     Exhibit 10.  This is the transcript of

13  the hearing we had on May 31.  You were at this hearing,

14  weren't you, Mr. Berge?

15           A     Is this still within two?  Oh, I'm on

16  one.

17           Q     This should be in Binder one, Mr. Berge.

18           A     Exhibit 10 –

19           Q     Look at the first page of that.  This was

20  the transcript from the May 31, 2013 hearing.  You were at

21  that hearing, weren't you, Mr. Berge?

22           A     I'm not seeing what page you're wanting

23  to refer me to.

24           Q     If you will stop looking at the exhibit

25  I'll just ask you a question.  You were at this

54

```
 1   hearing, weren't you, Mr. Berge?

 2              A    Which hearing was this?

 3              Q    May 31, 2013 in front of Judge Trauger

 4   across the street.

 5              A    The preliminary injunction?

 6              Q    Preliminary injunction hearing.

 7              A    Yes.

 8              Q    And while you were there you saw and

 9   heard Mr. Warlick say, and this is on Line 24, that David

10   Berge is the one that runs that company, referring to

11   Realysis of Memphis.

12              A    Yeah, that's a false statement.

13              Q    You never asked Mr. Warlick to correct

14   that statement, did you?

15              A    I'm not supposed to stand up in the

16   middle of court.

17              Q    There were times during that hearing when

18   Mr. Warlick wasn't speaking and he was sitting at the table

19   and you could have talked to him.  You could have talked to

20   him afterwards, and you did talk to him afterwards, didn't

21   you?

22              A    For a very short time.

23              Q    And you didn't say, "Mr. Warlick, the

24   things you said in that hearing aren't true, please correct

25   them."
```

1          A    No, I didn't say that.

2          Q    And after the hearing your main

3     impression wasn't, "Wow, my attorney and my father just lied

4     to a federal judge," was it?

5          A    No, I think my father was – backed off of

6     a lot of stuff he said in the deposition and, you know,

7     started telling the truth.  I mean I can't remember

8     everything that went on during that thing and what was said.

9     I stepped out a couple of times.

10          Q    If we were to go through your father's

11     testimony, Mr. Berge, we would see that your father didn't

12     start telling the truth there, did he?

13          A    I was never deposed about this and he

14     never gave me a chance to tell my side.  If I had actually

15     got up there I would have told the truth, regardless of

16     whether it hurt my father or not.  That's what I did at the

17     deposition when you finally gave me a chance to speak for

18     myself but it was already in Bankruptcy Court and I had

19     already lost.  All I can do is tell the truth.

20          Q    You never took any steps to ensure that

21     your father told the truth, did you, Mr. Berge?

22          A    No, I've been very non-proactive about

23     this whole thing.  When I found out he was being sued, I

24     said, "This is your mess, you figure it out, you get the

25     attorney.  I don't want to hear about it unless I have to."

56

1    And maybe that was bad on my part but I didn't want to have

2    anything to do with it.

3              Q    And what you didn't want to have anything

4    to do included the possible consequence to the Plaintiff in

5    that case, did it, Mr. Berge?

6              A    The Plaintiff being my father?

7              Q    No, MarketGraphics.  You were indifferent

8    as to whether or not the business that you asked your father

9    to get a lawyer and defend harmed MarketGraphics, weren't

10   you?

11             MR. LEFKOVITZ:  Your Honor, I'm giving

12   Mr. Krog a wide berth here but we're talking about a trial

13   and the action and whether that goes to the maliciousness of

14   a copyright infringement.

15             THE COURT:  Go ahead and ask this

16   question.

17   BY MR. KROG:

18             Q    Mr. Berge –

19             A    When my father asked me to help, he said

20   he was in trouble, he was 70 years old and that he was broke,

21   and could I help him.  He was going to venture out and try to

22   do something on his own.  I didn't ask questions.  He's my

23   father.  I've always trusted him.  We've had a good

24   relationship.  It wasn't an employee/employer relationship,

25   it was my father who raised me, who I respected and who I

57

1   trusted.  And I didn't – as far as MarketGraphics, I didn't
2   know the success of Realysis of Memphis.

3                          I mean MarketGraphics is great in their
4   own right and they have a very positive brand I.D.  And when
5   my father's Realysis company was competing with them, how was
6   I supposed to know the outcome?  Out of 22 bank clients in
7   Memphis, they picked my father out of 20.  It could have gone
8   the other way.

9               Q    Well, but Mr. Berge, you were working for
10  your father and you wanted your father to be the one who was
11  picked, didn't you?

12              A    Not even exactly.  He needed my help and
13  I said I would help him and I just kept doing what I'd always
14  done, regardless of the results.  If he had only got a couple
15  then I probably still would have helped him do the marketing
16  and vastly decrease the amount of money just as long as, you
17  know, I could pay my bills.  I mean –

18              Q    You were going to help your father with
19  his Realysis business whether he took a few clients or all
20  the clients of MarketGraphics, weren't you?

21              A    Uh-huh.

22              Q    And is it fair to say, Mr. Berge, that
23  you consciously disregarded the danger that posed to
24  MarketGraphics, wouldn't it?

25              A    Right.

```
 1                  Q      Let's go back to the preliminary

 2     injunction hearing, Mr. Berge.  Afterwards, as I say, your

 3     main thought was not, wow, some of the things that were said

 4     in there were untrue, was it?

 5                  A      Oh, I thought there were plenty of things

 6     that were said in there that were untrue.

 7                  Q      Well, you didn't confront your father or

 8     confront Mr. Warlick about that, did you?

 9                  A      I confronted my father, absolutely.  I

10     ranted and raved all the way on the drive back to Memphis.

11     There's a text or an email from my father to Dan.  His mother

12     had just died.  We're not going to just rip him apart and,

13     plus, he's still our attorney.

14                  Q      Well, you've seen this email before,

15     haven't you, Mr. Berge?

16                  A      No, I haven't but I know of it.

17                  Q      All right, Mr. Berge, I think the record

18     will show that you produced this email in the case and that

19     your father forwarded it to you as reflected on the header.

20     He forwarded it to you on June 3rd, the day after it was sent

21     to Mr. Warlick.

22                  A      Yeah, but he wrote it to Warlick.

23                  Q      And the one thing that your father said

24     that you contributed to the discussion here was something

25     about "we got our ass kicked."
```

59

1          A    Right.

2          Q    And, actually, your father goes on and is

3    essentially rather harsh to Mr. Warlick in this email, isn't

4    he?  And accusing Mr. Warlick of not being prepared and not

5    doing his job, and concludes that you lost because

6    MarketGraphics' attorney had ex parte communications with

7    Judge Trauer prior to the hearing.  Do you remember that part

8    of the email?

9          A    I don't remember reading this.  I mean my

10   dad would forward me stuff all the time.  Most of the time I

11   would just scan it, scan it as in just look it over, and then

12   just dismiss it.

13         Q    Do you share your father's impression,

14   Mr. Berge, that MarketGraphics' attorney and Judge Trauer

15   had ex parte communications prior to the preliminary

16   injunction hearing?

17              MR. LEFKOVITZ:  Object to the relevance.

18              THE COURT:  Sustained.

19   BY MR. KROG:

20         Q    Whatever you said to your father on the

21   way back to Memphis, Mr. Berge, about the untruth in the

22   preliminary injunction hearing, that didn't make enough

23   impression on him to make it into his email to Mr. Warlick,

24   did it?

25              A    No, my dad is a nice guy.  He's not

60

1    going to rip apart our attorney in the state that he's in.

2    He's about to go and do a memorial service for his mother on

3    his way.  I mean –

4                Q    Well that email was sent after Mr.

5    Warlick's mother's funeral, wasn't it?

6                A    That's semantics.  His mom just died.

7    And, also, we didn't want to hurt our relationship between

8    Warlick.  It wasn't done.  I thought we were still going to

9    be in a trial.  We didn't know he was not going to like

10   contest your motion for preliminary injunction and leave me

11   high and dry.

12               Q    Mr. Berge, you knew that, in early

13   October 2012, that MarketGraphics had seen a letter to

14   Memphis area clients saying it was going to pick up their

15   MarketGraphics service, didn't you?

16               THE COURT:  Realysis?  Which one sent

17   what?

18               MR. KROG:  I'll rephrase that to make the

19   history clear, Your Honor.

20   BY MR. KROG:

21               Q    After your father sent his email you

22   looked at on September 28, 2012, requesting to terminate his

23   associate agreement with MarketGraphics, MarketGraphics

24   agreed to that termination, didn't they?

25               A    Right.

61

1          Q     Your father didn't tell them at that time

2    that he was going to be operating this competing business,

3    did he?

4          A     Not that I'm aware of.

5          Q     And you knew that several days after

6    that, the first week of October, 2012, that MarketGraphics

7    Research Group sent a letter to the clients in Memphis who

8    had been using MarketGraphics of Memphis, saying, in

9    substance, Mr. Berge is retiring and will be unable to

10   provide your MarketGraphics service now, correct?

11         A     I can't remember if I actually read the

12   letter or not, or if my father just, basically, told me about

13   it.

14         Q     And if we look back at your deposition,

15   you remembered more clearly then, Mr. Berge.

16         A     Yes.  It's been two years since my

17   deposition so – what line are we looking at?

18         Q     Right down at the very bottom.  And

19   there's a cross-reference in here but from Lines 22 on down,

20   you were asked, "Did you have any understanding when you read

21   the statement before it was sent out (inaudible – static) as

22   to what letter this Plaintiff was referring to?"  And you

23   answered, "I was aware that Edsel Charles had sent out a

24   letter but I didn't read it."

25         A     Okay.

1          Q    So, you knew that letter had gone out.

 2    And the letter, Mr. Berge, was this letter to clients that

 3    I've been speaking of, saying that MarketGraphics would be

 4    taking over their service.

 5          A    Right.

 6          Q    So, you knew that that's what

 7    MarketGraphics was going to do, that they were going to be

 8    asserting their rights under the associate agreement to

 9    continue servicing the clients after your father terminated?

10          A    I never read the associate agreement but

11    yeah.

12          Q    Well, you knew that it had a non-compete

13    provision, correct?

14          A    Right, that I was told continuously that

15    it wasn't valid, but yes.

16          Q    And you knew that MarketGraphics was

17    going to come in and (inaudible) to the non-compete, pick up

18    the clients that had been your father's, correct?

19          A    That's correct.

20          Q    And you are aware, aren't you, that Judge

21    Trauger ultimately ruled that those clients belonged to

22    MarketGraphics, correct?

23          A    Right, because in the preliminary

24    injunction you weren't saying that they were my father's

25    clients.  Bulso kept saying they were MarketGraphics'

                                                              63

1    Nashville clients the whole time, which I disagree with.

2              Q    Well, Judge Trauger disagreed with you,

3    Mr. Berge, didn't she?

4              A    She agreed with Bulso, yes.

5              Q    That those clients had been cultivated by

6    —

7              A    She just said that they were our clients.

8              Q    They were the clients your father had

9    cultivated pursuant to the associate agreement with

10   MarketGraphics for MarketGraphics' benefit, correct?

11             A    For MarketGraphics' benefit?

12             Q    MarketGraphics had the right to service

13   those clients after your father terminated, after the

14   associate agreement was terminated?

15             A    If that's what it said on the associate

16   agreement, yes.

17             Q    There was a letter sent out from Realysis

18   of Memphis in response to the letter that we previously

19   talked about from Mr. Charles, wasn't there?

20             A    Yes, what my dad liked to refer to as the

21   verification letter.

22             Q    And if we look briefly at Exhibit 48 —

23             A    The one from October 4, 2012?

24             Q    Yes, Mr. Berge.  You understand that

25   that's the letter from Edsel Charles that we've referred

                                                              64

1    to, correct?

2              A    Yes.  I never read this.

3              Q    But that's the letter to which your

4    father referred?

5              A    That's correct.

6              Q    If we look at Exhibit 58, Mr. Berge, this

7    is what you referred to a minute ago as the verification

8    letter, isn't it?

9              A    That's correct.

10             Q    You saw this letter before it was sent,

11   didn't you, Mr. Berge?

12             A    That's correct.

13             Q    And the letter was sent as an attachment

14   to an email to all of the people for whom your father had

15   been doing business in Memphis?

16             A    Yes, I would assume so.

17             Q    Can we turn to the second page, Mr.

18   Berge?  This letter is written in your name, isn't it?

19             A    That's correct.

20             Q    And it was written in your name when you

21   read it before it was sent?

22             A    That's correct; it was.

23             Q    And when you looked over this letter

24   before it was sent, you didn't object to anything in it, did

25   you?

65

1          A    No.

2          Q    In fact, you told your father that it was

3    fine.

4          A    Yes.

5          Q    And you agree, Mr. Berge, that this

6    letter is an attempt to persuade the various people with whom

7    your father had been doing business in Memphis to keep doing

8    business with him via Realysis of Memphis and not to do

9    business with MarketGraphics, don't you, Mr. Berge?

10         A    It could be perceived that way.  I think

11   his intention was to inform the clients that MarketGraphics

12   of Memphis was no longer going to be audited by my father and

13   myself.  There's other stuff in there, too.

14         Q    There's quite a bit more in here, isn't

15   there, Mr. Berge?

16         A    Yes.

17         Q    Including, Mr. Berge, several statements

18   that are just plain false, aren't they, Mr. Berge?

19         A    Which ones are you referring to?

20         Q    Well, if you'll look at the second

21   paragraph, you'll see that the LGLG (phonetic) letter was

22   sent to those who have been clients of my father, Donald

23   Berge, for many years.  And in bold, "who have not been

24   clients of MarketGraphics Research Group in Nashville."

25   That's not a true statement, is it, Mr. Berge?

66

```
 1              A     I believe it to be true, yes.

 2              Q     Well, Judge Trauger determined that it

 3   wasn't true, didn't she, Mr. Berge?

 4              A     By the motion for summary judgment?

 5              Q     The preliminary junction hearing on May

 6   31, 2013, Judge Trauger said, in words of one syllable,

 7   essentially, that these people had been clients, that they

 8   were MarketGraphics' clients.

 9              MR. LEFKOVITZ:  Your Honor, I object to

10   that.  We're sitting up here and the witness has testified

11   that he believed it to be a truthful statement.  Whether or

12   not the Court agreed or accepted that opinion, it was still

13   his opinion at the time he uttered it that he believed that

14   paragraph.  The Court disagreed with that.  That doesn't make

15   it false.

16              THE COURT:  Go ahead.  Move along.

17   BY MR. KROG:

18              Q     Mr. Berge, you knew when you –

19              A     In addition to that, we have evidence, my

20   father has evidence that never came to light that disputes

21   these things but we never got a trial.

22              Q     Mr. Berge, you were aware when you read

23   this letter that your father had a non-compete with

24   MarketGraphics, correct?

25              A     Yes.  I was told on most locations he
```

67

1    did not believe it to be valid.

2            Q    Looking at the fifth paragraph, Don Berge

3    terminated, that sentence isn't a true statement either, is

4    it, Mr. Berge?  Isn't it true that the associate agreement

5    was terminated by mutual consent of your father and

6    MarketGraphics?

7            A    Semantics.

8            Q    That's not a true statement, is it, Mr.

9    Berge?

10           A    He initiated the termination and they

11   agreed.

12           Q    Mr. Berge, your father did not

13   unilaterally terminate the associate agreement, did he?

14           A    I don't know what you mean by that.

15           Q    The last sentence of that same paragraph,

16   Mr. Berge, there's a reference to the Realysis data tool.

17           A    Uh-huh.

18           Q    That was an online accessible electronic

19   database that included the market data that was found in the

20   reports, wasn't it, Mr. Berge?  I'm just asking a question

21   about the data tool, Mr. Berge.

22           A    Back in 2009?

23           Q    Between 2009 and 2012.  The data tool was

24   an electronic database that you accessed and downloaded

25   housing market information, correct?

                                                      68

1          A     Yes.

2          Q     There was no forecasting function in that

3   data tool, was there, Mr. Berge?  It was just data?

4          A     Right.

5          Q     So, when this letter says that the data

6   tool existed to address questionable and statistically

7   unsound forecasting methodology in the MarketGraphics Report,

8   that's not a true statement, is it?  It had nothing to do

9   with the forecasting, did it?  There was no connection

10  whatsoever between the data tool and MarketGraphics'

11  forecasts?

12         A     I don't know the answer to that.  My dad

13  created the data tool and he made this statement, so

14  inadequacies and deficiencies, I had nothing to do with the

15  back end of MarketGraphics of Memphis and I had nothing to do

16  with the back end software of Realysis, and I didn't read the

17  reports.  So, once again, I was just going off my father's –

18         Q     Mr. Berge, you told us just a moment ago

19  that the data tool didn't contain forecasting, didn't you?

20         A     I believe so.  I don't believe my father

21  did forecasting.

22         Q     So there wouldn't be any connection

23  between the data tool and MarketGraphics and forecasting,

24  would there be?

25         A     I guess not.

69

1          Q    Will you turn to the second page, Mr.

2    Berge?  Look at the second-to-last paragraph.  "I feel that

3    the degree of accuracy and detail that will go into the

4    future MarketGraphics Reports will not approach the accuracy

5    and detail of the Realysis Reports."  You had no way to

6    guarantee that, did you, Mr. Berge?

7          A    I believe it to be true.

8          Q    You and your father both believe that?

9          A    Yes.  I was real meticulous with making

10   sure I had everything right and after driving the area for 15

11   years I had gotten to know the market pretty well (inaudible)

12   another city and just do a blitz.

13         Q    Mr. Berge, this letter doesn't mention

14   the fact that your father has a non-compete agreement with

15   MarketGraphics, does it?

16         A    That's correct.

17         Q    And you agree that if the non-compete is

18   enforceable, could we assume that, and if the letter is

19   misleading by omitting it?

20              MR. LEFKOVITZ:  Objection.  That calls

21   for a conclusion.

22              THE COURT:  I'll let him answer.

23              THE WITNESS:  Can you ask that again?

24              MR. KROG:  Right.

25   BY MR. KROG:

70

1          Q     If your father's non-compete with

2    MarketGraphics is enforceable, the letter, by failing to

3    reference it, is misleading, isn't it, Mr. Berge?

4          A     I don't think the letter itself is

5    misleading.  It's all pretty factual.  He was working on the

6    knowledge that it was wasn't valid and I don't think it's

7    common practice to inform people that you have a non-compete

8    that you've been told by your lawyers is not valid.

9          Q     Well, Mr. Berge, didn't you agree in your

10   deposition with my statement?  You are giving an assessment,

11   you will agree, though, Mr. Berge, that if the (inaudible)

12   precluded from selling market research services to the

13   recipients of this letter that the letter would be

14   misleading.  You answered, "Yeah, that's if the non-compete

15   was valid."

16         A     That's right.  That's what I'm saying.

17         Q     You agree, Mr. Berge, don't you, that the

18   presence of the non-compete and the fact that your father was

19   breaching it by continuing the market research business, that

20   might be something that people that he's sending that letter

21   to might want to know?

22         A     Possibly.

23         Q     I mean you agree that a bank might want

24   to know if it's doing business with somebody who doesn't keep

25   his agreements?

71

```
 1                      MR. LEFKOVITZ:  Again, Your Honor, that

 2    calls for a conclusion.  There's no way he can answer that.

 3                      THE COURT:  Go ahead and answer.  I'm not

 4    sure how relevant that is but go ahead.

 5                      THE WITNESS:  Would you repeat it again?

 6    BY MR. KROG:

 7            Q      You agree that a bank might like to know

 8    if it's doing business with somebody who doesn't keep

 9    agreements he signs?

10            A      Possibly, yes.

11            Q      It's more likely than not.

12            A      In a relationship with my father for 10

13    or 15 years, if he had mentioned that there was a non-compete

14    but that he was fighting it, there's still a good chance I

15    would have gone with him anyway.

16            Q      You agree that it's more likely than not,

17    Mr. Berge, that a bank –

18            A      I have no idea what bankers would think.

19    I have no idea what decisions they make.  I don't know

20    (inaudible).

21            Q      Do you think banks, generally, like

22    dealing with dishonest people?

23                      MR. LEFKOVITZ:  Objection.

24                      THE COURT:  Sustained, sustained.

25    Speculative.
```

1  BY MR. KROG:

2          Q      Do you like dealing with dishonest

3  people, Mr. Berge?

4                  MR. LEFKOVITZ:  Objection, Your Honor,

5  that's argumentative.

6                  THE COURT:  Sustained.

7  BY MR. KROG:

8          Q      Mr. Berge, you told your father that the

9  October 30 letter was fine, didn't you?

10         A      Yeah.  He asked me, you know, look

11  through it and see if you see any typos.  I gave it a quick

12  through and I said, "That's fine with me."  I didn't sit

13  there and pick it apart.

14         Q      You didn't tell him not to send it with

15  your name on it?

16         A      No, I didn't not.

17         Q      One of the reasons your father sent this

18  letter with your name on it, Mr. Berge, is because he knew

19  that when he was sued by MarketGraphics it would become

20  evidence and it would support his defense that –

21                  MR. LEFKOVITZ:  Objection.  That's beyond

22  –

23                  THE COURT:  Sustained.  I don't know what

24  he knew about what his father thought or – his father can say

25  what he knew.

73

1    BY MR. KROG:

2              Q     Mr. Berge, you knew, in October of 2012

3    when you looked at this letter, that if and when you were

4    sued by MarketGraphics, as you were anticipating, that the

5    letter would become a piece of evidence, didn't you, Mr.

6    Berge?  You knew that it would be available –

7              A     You give me too much credit, man.  I

8    didn't – this was not my baby.  This was my father's doing.

9    He asked me what I thought and I said yes but I didn't make

10   decisions that – I was so very much in the backseat I

11   probably wasn't even in the car.  I mean I'm not even living

12   in Memphis.  He's not asking me permission to do all this

13   stuff.  And to the extent of the emails that he wrote under

14   my name, I had no idea of the extent of it.  The only one I

15   knew for sure was this one.

16             Q     Well, Mr. Berge, you've admitted

17   previously in this case that you sent several other emails

18   that were related to the October 30 email, haven't you?

19             A     No.  My dad might have sent them and put

20   my name on them.

21             Q     Mr. Berge, do you recognize Exhibit 65 as

22   the responses that you gave to certain discovery requests in

23   this case?  You can look at them in the book there behind

24   you.  It's at Tab 65, Volume 2.

25             A     Okay.

74

```
 1                    Q    And if you turn to the end in the book or

 2    look at the screen on Page 29, that's your signature, isn't

 3    it, Mr. Berge?

 4                    A    You're talking about Exhibit 65, correct?

 5                    Q    Yes.

 6                    A    My page goes to 25.

 7                    Q    I believe they're in there out of order.

 8    Would you look at the second-to-last page?

 9                    A    Yeah, it goes to 29 and then the one

10    after it goes to 25.

11                    Q    That's your signature, isn't it, Mr.

12    Berge?

13                    A    Yes.

14                    Q    If we could look at Page 22.  No. 5 in

15    the middle of the page, your response here, Mr. Berge.  Your

16    response, Mr. Berge, is that you sent certain communications

17    that were attached as Exhibit 1 to the requests, correct?

18                    A    Right.  It says, "And sending the

19    communication was to clarify the distinction between

20    MarketGraphics Research Group and Realysis, that I'm

21    admitting to having read the verification letter.  That is

22    the only thing I read with my name on it that my father

23    sent."

24                    Q    Well, that's not what you say in number

25    five here, is it, Mr. Berge?
```

```
 1              A    Yes, it is.

 2              Q    Where in your response to No. 5 here, Mr.

 3   Berge, does it say that you only read one letter with your

 4   name on it and didn't send any of them?

 5              A    It's clear by my last statement it was a

 6   clarification letter.

 7              Q    The last statement being the last

 8   sentence in this response?  Because I see a sentence that

 9   says Mr. Berge's purpose in sending the communication.

10              A    Yeah, the communication.

11              Q    You'll agree, Mr. Berge, won't you, that

12   the request asks about - you'll agree, Mr. Berge, that the

13   response doesn't say anything about which communication?

14              A    That's what it's referring to.

15              Q    And Mr. Berge, I'd like you to look at

16   Exhibit 54.

17              A    Going back to one, right?

18              Q    No, it's still Binder two.

19              A    Fifteen?

20              Q    Pardon me?

21              A    Fifteen?

22              Q    Fifty-four.

23              A    Okay.

24              Q    And if you turn to Page 24, that would be

25   the page which, Exhibit 1 to which that previous answer
```

76

1   was referring again, isn't it, Mr. Berge?

2              A    (Inaudible).

3              Q    And then behind that page there are an

4   email from October 30, the October 30 letter which was

5   attached to it, and October 31 email and November 9 email.

6              A    You want me to read –

7              Q    No, I didn't ask you to read any of them,

8   I just was – those are the documents that were Exhibit 1 to

9   that discovery request, correct?

10             A    I imagine.

11             Q    You knew, Mr. Berge, didn't you, that

12  many of the people with whom your father was doing business

13  would do business with Realysis of Memphis, didn't you?

14             A    I didn't know that to be a fact.

15  MarketGraphics could have took them all as far as I know.

16             Q    You didn't want that to happen, though,

17  Mr. Berge, did you?

18             A    Honestly I didn't give it much thought.

19             Q    You didn't really think about whether or

20  not what you were doing would harm MarketGraphics, did you,

21  Mr. Berge?

22             A    Once again –

23             Q    You wanted to get –

24             THE COURT:  Let him answer first.

25             THE WITNESS:  Once again, my

                                                        77

1    relationship with my father is a strong one.  I could tell

2    his back was up against the wall and he asked for my help.

3    That was my main focus was to help my parents from not being

4    broke at retirement age.  I had always viewed those clients

5    to be my father's but my dad has (inaudible) that they were

6    his clients.  It just never came into play.  My goal was to

7    help my family survive.  That's something any son would try

8    to do.

9    BY MR. KROG:

10              Q    And you did help your father operate

11   Realysis of Memphis, didn't you?

12              A    I helped him as far as nine weeks,

13   actually it was up to 12 weeks over the course of a whole

14   year.  If you want to say that was helping him immensely,

15   then that's your opinion.  I don't think 12 weeks a year is

16   considered anything that –

17              Q    Well, that's all it took to produce the

18   data in the books, wasn't it, Mr. Berge?

19              A    (Both speaking).  It was his consulting

20   and he had an ongoing relationship and they were buying into

21   Don Berge, they weren't buying into Realysis.

22              Q    Mr. Berge, the –

23              A    My –

24              THE COURT:  Whoa, one at a time.  Ask the

25   question.

78

1  BY MR. KROG:

2          Q     The nine to 12 weeks of driving, Mr.

3  Berge, which was not all you did, was it, Mr. Berge?  We've

4  seen that today, correct?

5          A     Yes, there was some research that was

6  required before you could do the drives.

7          Q     Mr. Berge, that was all it took to

8  produce the data that was in the book, wasn't it?

9          A     That's correct.

10         MR. KROG:  No other questions at this

11  time, Your Honor.

12         THE COURT:  Okay, let me ask a question.

13  Do you all want lunch or are you willing to go all the way

14  through?  I'm going to take a break right now.  It's only

15  going to be five minutes or we can break later for lunch.

16         MR. LEFKOVITZ:  Your Honor, my cross-

17  examination of Mr. Berge will take 10 minutes.

18         THE COURT:  Okay.  Let's take a five-

19  minute break.

20              (Brief recess)

21              CLERK:  All rise.

22              THE COURT:  Be seated.

23         **CROSS-EXAMINATION**

24  BY MR. LEFKOVITZ:

```
 1                  Q    Mr. Berge, thank you for your testimony

 2     this morning.  Let me ask you one question and I think it

 3     goes to the essence of the issue before the Court.  Your

 4     testimony, as I heard in the last couple of hours, was that

 5     all of your actions were predicated on your father telling

 6     you that the non-compete was invalid; is that correct, sir?

 7                  A    That's correct.

 8                  Q    Had your father told you that based on

 9     his discussions with lawyers that the non-compete was valid

10     and that he couldn't do this, would you have gone down this

11     road?

12                  A    No.

13                       MR. LEFKOVITZ:  I turn the witness over.

14     Thank you.

15                       THE COURT:  Re-Cross - Redirect?

16                       MR. KROG:  No Redirect, Your Honor.

17                       THE COURT:  You may step down, sir.  Next

18     witness?  Question:  Do you all want to have lunch or do you

19     all want to just keep plowing through this?

20                       MR. KROG:  If Mr. Lefkovitz would like a

21     break for lunch I am perfectly content to take it now, Your

22     Honor.

23                       MR. LEFKOVITZ:  I'll leave it to the

24     Court's discretion.

25                       THE COURT:  Let's keep going.
```

80

```
 1                    MR. LEFKOVITZ:  Let's keep going on this.

 2                    THE COURT:  We might have a late lunch.

 3                    MR. LEFKOVITZ:  Or we can send out.

 4                    MR. KROG:  Your Honor, the Plaintiff

 5   calls Mr. Donald Berge to the stand.

 6                    MR. LEFKOVITZ:  Your Honor, just so we

 7   know the parameters -

 8                    THE COURT:  Let's not talk about what

 9   we're doing here.

10                    MR. LEFKOVITZ:  Okay, then let's just

11   keep going and I'll wait to see where -

12                    THE COURT:  Because he was outside.

13                    MR. LEFKOVITZ:  All right.  I heard no

14   names.

15                        (Witness sworn)

16                    CLERK:  State your full name for the

17   record, please.

18                    THE WITNESS:  Donald John Berge.

19   THEREUPON came

20            D O N A L D   J O H N   B E R G E

21   Who, having been first duly sworn according to law, testified

22   as follows:

23                       **DIRECT EXAMINATION**

24   BY MR. KROG:

25                    Q    Good Morning, Mr. Berge.
```

```
1            A     Hello.

2            Q     Mr. Berge, you worked from 1997 until

3     2012 under the name MarketGraphics of Memphis under an

4     associate agreement with MarketGraphics Research Group, Inc.,

5     didn't you?

6            A     MarketGraphics National.

7            Q     Was the name under which the agreement

8     was signed?

9            A     Yes.

10           Q     And then MarketGraphics National later

11    changed its name to MarketGraphics Research Group?

12           A     Yes.

13           Q     If you will please look in the second of

14    the two black binders that are there.

15           A     The one on top?

16           Q     I'm afraid I don't know which one is on

17    top, Mr. Berge.

18           A     All right, what do I need to look for?

19           Q     Tab 29.

20           A     Some of this is upside down.

21           Q     Is Exhibit 29, Mr. Berge, the associate

22    agreement you had with MarketGraphics?

23           A     Yes.

24                 MR. KROG:   Your Honor, I would move that

25    Exhibit 29 be admitted into evidence.
```

82

```
 1                    MR. LEFKOVITZ:  No objection.

 2                    THE COURT:  Be admitted.

 3                    (Exhibit 29 admitted)

 4   BY MR. KROG:

 5          Q     Your son is Mr. David Berge, correct?

 6          A     Correct.

 7          Q     And he worked with you during the period

 8   you were doing business as MarketGraphics of Memphis,

 9   correct?

10          A     He did some of the audit work.

11          Q     You took steps over the years, during the

12   MarketGraphics of Memphis period, to introduce the banks with

13   which you did business and the appraisers and the other

14   people that you did business as MarketGraphics of Memphis,

15   you took steps to introduce those people to David during the

16   MarketGraphics of Memphis period, didn't you?

17          A     During the MarketGraphics of Memphis

18   period, if I introduced David it was probably in a group

19   setting.  I held meetings with my clients and sometimes he

20   was there if he was in town.

21          Q     If you'd look at Tab 36, please, Mr.

22   Berge.  Is this a letter you sent in February of 2004 to

23   clients in the Memphis area?

24          A     Yes.

25          Q     And you say in this letter that your
```

1  son has agreed to take on a more prominent role with

2  MarketGraphics?

3           A    This letter says that he had been doing,

4  he had only been auditing only the Shelby County and now he

5  was going to add DeSoto, which is another big piece of it,

6  for his audit, to do the audit work.  Because I was starting

7  to work — it was a temporary job that ended up being over two

8  years, but as manager of the commercial real estate group for

9  InSouth Bank in Memphis, who was one of my clients at the

10 time.  They hired me because the manager of the group had

11 left and they wanted me to fill in for him.  So, David would

12 have to do more of the audit work.

13          Q    And he agreed to do that, didn't he, Mr.

14 Berge?

15          A    Yes.

16          Q    And if you'll look at the next tab, Tab

17 37.  Is this a letter that you sent in October of 2005 to the

18 same Memphis area clients?

19          A    I was still at InSouth, right.

20          Q    This is a letter you sent in October

21 2005?

22          A    Yes.

23          Q    On the second page of this letter you,

24 again, refer to your son, David, don't you, Mr. Berge?

25          A    Yes.

1          Q     And is it true that he was handling

2    virtually all of the field audit work?

3          A     He did mostly Shelby County.  There were

4    a few areas in Shelby County that I always did, and he was

5    doing most of DeSoto County.  I was doing three counties and

6    a little bit of Shelby.

7          Q     And the people with whom you did business

8    as MarketGraphics of Memphis knew that because you told them

9    that David helped out with the business, correct?

10         A     Right.

11         Q     Following the termination of your

12   associate agreement with MarketGraphics, did you transition

13   to a gopher role for David's Realysis Memphis business?

14         A     I was starting to make moves toward being

15   retired.  In fact, my – and you've seen this, I'm sure – my

16   termination letter was the fax that was a reply fax – not a

17   reply fax but a reply email to them because it had the

18   caption, "Thinking about retirement."  I had gotten an email

19   from the office saying Edsel wanted everybody to see this.

20   It was a bunch of information about retiring.  So, I replied

21   to that and in that I said, "I'm going to terminate as of

22   September 28."  So, I was thinking in terms of doing – I was

23   moving toward retirement.  I was 69 years old at the time.

24   But with a lawsuit coming, it stopped all that.  So, I

25   basically continued to operate the business.

```
 1                    Q    Well, Mr. Berge, didn't you previously

 2    testify on this topic as follows:  (Audio of Mary 13, 2013

 3    deposition played in open court.)

 4                         Do you recall giving that testimony, Mr.

 5    Berge?

 6                         THE COURT:  Did you answer that question?

 7    Do you recall giving that testimony?

 8                         THE WITNESS:  Yes.

 9                         THE COURT:  Okay.  You have to speak into

10    the mic.

11                         THE WITNESS:  Oh, I need to get closer to

12    the mic, don't I?  I'm sorry.

13    BY MR. KROG:

14                    Q    Was that truthful testimony, Mr. Berge?

15                    A    I was trying to retire.  A lawsuit

16    stopped me.

17                    Q    You can try to retire and hand the

18    business operations for the new Realysis of Memphis over to

19    your son because he knew the business pretty well, didn't he?

20                    A    He knew how to audit the business; he

21    knew how to do the audits.

22                    Q    Well, Mr. Berge, isn't it true that you

23    would take David with you sometimes to see banks, bank

24    representatives, and that he could answer questions regarding

25    the consulting work even better than you could?
```

86

1          A    If they had a question about a particular

2    subdivision that he had audited, that's true.

3          Q    Mr. Berge, I'm going to ask if you

4    remember giving some testimony during a previous deposition –

5          A    Three years ago?  Is that the one you're

6    talking about?

7          Q    "Mr. Berge, in your opinion, are you

8    identified with Realysis of Memphis among persons in the

9    Memphis community?"  And you said, "They know my son; they

10   got letters from my son."

11         A    Uh-huh.

12         Q    They know my son, David, as the principal

13   of Realysis of Memphis, and they've been dealing with me for

14   15 years, there's nobody else, and I'm on their speed dial so

15   they call me.  Why wouldn't they?  I'm a consultant.  I mean

16   I consult.  I had one the other day say, 'Let's go to lunch.

17   Questions about the market and about selling lots for the

18   bank and all these kind of things.'  And it had nothing to do

19   with the report, they just wanted some advice."

20              Question:  In your opinion, would David

21   be able to provide those same consulting services?  And your

22   answer:  Yes.  Follow-up question:  Equally as well?  And you

23   said:  I've had some banks have us both come.  And he knew

24   more detail about the market when they started asking than I

25   did.  He knows that stuff because he audits it.  See, I

87

1  don't audit hardly at all.

2                    Do you remember that testimony, Mr.

3  Berge?

4           A     Yeah.  I mean it's three years ago.  I

5  can't tell you I agree.

6           Q     Was that truthful testimony at the time,

7  Mr. Berge?

8           A     I remember - I was probably referring to

9  our visit to the Bank of Bartlett when we had a couple of the

10  owners of the company were asking him a lot of questions

11  about this one particular subdivision that he had audited,

12  and he knew all about the subdivision because he audited it.

13  So, he knew more in that meeting than I did on that

14  particular subdivision.  I'm sure that's what it was.  And

15  he's probably only gone to about five of them with me.

16          Q     And those are the five you went to during

17  the Realysis of Memphis period, isn't it?

18          A     Right.

19          Q     When you took him to introduce him as the

20  President of Realysis of Memphis?

21          A     I don't know if I said President of

22  Realysis of Memphis.

23          Q     You took the books with you when you went

24  on those meetings, didn't you, Mr. Berge?

25          A     Yeah.

```
 1                  Q      And if you look at the Realysis Book,

 2    it's right there next to you on the ledge.

 3                  A      Yes.

 4                  Q      On the second page where it says, "Dear

 5    Client."

 6                  A      Second page.  Page two or –

 7                  Q      It's not numbered but it is Page 2.

 8                  A      Oh, okay.

 9                  Q      And that introductory letter to this

10    report is signed David P. Berge, isn't it?

11                  A      It's not signed but that's his name.

12                  Q      It says, "Sincerely, David P. Berge,"

13    doesn't it, Mr. Berge?

14                  A      Correct.  I wrote it.

15                  Q      And you gave it to these people in

16    Memphis with whom you were doing business, correct?

17                  A      Memphis and other places.

18                  Q      Including all these visits –

19                  A      Most of these were sent either by U.S.

20    Postal Service or FedEx or sometimes – but we delivered a

21    couple of them in DeSoto County real close by where I live.

22    There was about five of them.

23                  Q      And you took them in person and David

24    went with you?

25                  A      That's true.
```

```
 1              Q    The Realysis of Memphis business, Mr.

 2    Berge, was a continuation of what you had been doing as

 3    MarketGraphics of Memphis, correct?

 4              A    Say that again, please.

 5              Q    Sure.  The Realysis of Memphis business

 6    was a continuation of what you had been doing as

 7    MarketGraphics of Memphis, correct?

 8              A    Yes.

 9              Q    Your reports had the same basic data in

10    them?

11              A    I started Realysis in '09 –

12              Q    I'm only asking about the report, Mr.

13    Berge.

14              A    I continued what I had started in '09.

15    And, also, it was a continuation of what I did at

16    MarketGraphics of Memphis, except we had additional

17    information and better graphs and better stuff in there to

18    help the clients, per their requests.

19              Q    Again, Mr. Berge, my question was only

20    about the books.  I'm going to ask if you remember giving the

21    following testimony.  Down at the bottom your attorney asked

22    you –

23              A    When was this?

24              Q    You were present at the preliminary

25    injunction hearing on May 31, 2013?
```

1    A    Yes, I was.

2    Q    And you testified at that hearing?

3    A    Yes.

4    Q    And do you remember Mr. Warlick asking

5    you the question, "Tell me in your opinion and your

6    experience whether or not what Metro Study does is unique in

7    any way or different from what MarketGraphics does."   And

8    the Court didn't actually let you answer that question.   So,

9    Mr. Warlick asked you, "Which one came first?"  And you said,

10   "Metro Study was started in 1975."  And then for several

11   lines we talk about Metro Study and Mr. Warlick asks you,

12   "And now Mr. Berge is in the business of putting together

13   these types of data collection books, correct?"  And you

14   said, "Yes."

15   A    Wait, is that on this page?

16   Q    I'm looking at the one on the screen.

17   A    Right.

18   Q    If you'll look on Line 19, Question:

19   "Now, Mr. Berge is in the business of putting together these

20   types of data collection books, correct?"  Answer:  "Yes."

21   And if we look one line up, he's referring there to – you're

22   referring there to Mr. David Berge, aren't you?

23   A    Pardon me?

24   Q    When you answered that question you were

25   referring to Mr. David Berge?  Now Mr. David Berge is in

1    the business.

2              A      Now Mr. Berge – who was asking that

3    question?

4              Q      If we were to go back and look at this it

5    would reflect that Mr. Warlick was asking the question.

6              A      Okay, because I don't see that.  It's

7    expanded and I don't see the numbers on the side.  Okay, so

8    Dan Warlick is saying, "Now Mr. Berge –"  I don't know.

9    Who's he talking about?  I was the only witness.  It must

10   have been me, right?

11             Q      Well, Mr. Berge, let's go back up.  Let's

12   look at Line 13.  Mr. Warlick ask you, "Now, you have heard

13   it said or it was suggested that you are running Realysis of

14   Memphis, LLC.  Do you own stock in that company?"  Answer:

15   "No."  Question:  "Who owns all of it?"  Answer:  "It's a

16   (inaudible) LLC and it's David Berge."  Question:  "Now, Mr.

17   Berge is in the business of putting together these types of

18   data collection books, correct?"  Answer:  "Yes."

19                    And then there's some discussion about

20   procedural matters and after we get out on the next page,

21   Line 8, Mr. Warlick asks, "David Berge puts together this

22   same type of data?"  Answer:  "Yes."  Question:  "You admit

23   that it's similar to this type of data entry that's put

24   together?"  Answer:  "Same basic data."

92

1        And the point of all that, Mr. Berge, was

2   you did testify, didn't you, that the Realysis Books and the

3   MarketGraphics Books contain the same basic data about the

4   housing market, correct?

5        A     Same basic data as Metro Study?  That's

6   what was on there.

7        Q     As Metro Study and as MarketGraphics of

8   Memphis.

9        A     Well, Metro Study has much more data and

10  are much more thorough so I wasn't doing everything they did.

11  And, of course, MarketGraphics wasn't coming near what they

12  did.  There's an expression they had in their book, it's

13  called the four stages of development.  That's straight out

14  of Metro Studies.  I think Edsel has copied a bunch of that

15  stuff but when we audit the field, for auditing the same

16  subdivisions as MarketGraphics, when I was at MarketGraphics

17  of Memphis, same subdivisions.

18        Q     Same subdivisions as Realysis?

19        A     As this one, but the data wasn't the same

20  because Realysis was doing it every three months, not every

21  four months  So, we had altogether different data.

22        Q     Well, the numbers were different,

23  Mr.Berge, but you were collecting the same categories of

24  data.

25        A     No, it was fully different because we

93

1  did audits at different periods, four times a year. And,

2  also, we put in median home prices because our clients asked

3  for them. MarketGraphics would have some kind of a number

4  that was some kind of an average but it was just really bad.

5  And so I get a lot of complaints from my clients about

6  MarketGraphics. So, I changed that report quite a bit to

7  accommodate what the client wanted.

8              Q    Mr. Berge, the types of data that were

9  being collected, that were being collected by Realysis of

10  Memphis, were the same types of data that were collected by

11  MarketGraphics of Memphis?

12             A    Basically, there's a house count, the

13  number of houses. What you do with it is where the

14  difference is.

15             Q    And what Realysis of Memphis did with the

16  data, Mr. Berge, was put out a book and sold services to

17  clients in the Memphis area that had previously been serviced

18  by MarketGraphics of Memphis, correct?

19             A    By my clients.

20             Q    In fact, it was all the same people.

21  There weren't any new Realysis of Memphis clients, were

22  there?

23             A    Just my clients. I was just producing a

24  different looking book for them that was a lot better.

25             Q    And because they'd had a

```
 1   relationship with you in the past, Mr. Berge, David
 2   discovered –
 3              A    Who discovered?
 4              Q    David discovered that these clients, in
 5   many cases, did business with Realysis, correct?
 6              A    David discovered it?  I don't know what
 7   kind of question that is.
 8              Q    Well, Mr. Berge –
 9              A    I mean he had become aware of it –
10              Q    Mr. Berge, isn't that exactly what you
11   said in your previous deposition?
12              A    Of course, he would have discovered it.
13              Q    (Recording of deposition question played
14   in open court.)
15              A    Right, his company.
16              Q    There were certain client verification
17   letters, to use your phrase, that were sent out in October
18   and November of 2012, to businesses with which you did
19   business in Memphis, correct?  About the Realysis of Memphis
20   business.
21              A    Do you have them here?  Can we see them?
22              Q    I'm just asking the question.
23              A    Refresh my memory; it's been three years.
24              Q    If you'll turn to Tab 57, Mr. Berge.
25              A    Okay, yes, real short, right?  Real
```

95

1  short letter.

2          Q    Mr. Berge, that's an email that David

3  sent on October 30, 2012, isn't it?

4          A    No, I sent that.

5          Q    Is this one of the client clarification

6  letters?

7          A    Are you talking about this one page here?

8  Right.  Yeah, I sent that.

9          Q    There is attached another letter, isn't

10  there, Mr. Berge?

11          A    Where is that letter?

12          Q    Turn the page of the book, Mr. Berge.

13          A    Oh, yes, the purpose of the letter is

14  clear up the confusion resulting from misleading information

15  in a letter from Edsel Charles.

16          Q    This is one of the client clarification

17  letters, correct?

18          A    Right.

19          Q    And you've previously testified that

20  David sent this letter, haven't you?

21          A    I wrote it.  I put his name on it.  As

22  I'm moving into retirement, I'm trying to get people aware to

23  start to communicate with David –

24          Q    Well, Mr. Berge, you've just contradicted

25  two things that you just said previously under oath,

96

1    didn't you?

2              A    I don't know.

3              Q    (Video deposition excerpt played in open

4    court)  And if we look at Tab 59 in the book, Mr. Berge,

5    that's the letter to which you were referring that was sent

6    the next day, October 31?

7              A    Okay.

8              Q    Isn't it?

9              A    Okay.  Are you talking about what you

10   just showed in the testimony?

11             Q    Yes.  You testified, as we saw just a

12   moment ago, that there were three letters, October 30,

13   October 31, and November 9.

14             A    Right.

15             Q    And this is the middle one?

16             A    Okay.

17             Q    And if we turn to Tab 60, this is the

18   November 9 letter, isn't it, Mr. Berge?

19             A    Yes.

20             Q    And you told us at that time, Mr. Berge,

21   that David sent all three of these communications, didn't

22   you?

23             A    That was the intention for the people who

24   would see the letter and think it's from him, because I wrote

25   it.

97

```
 1                    Q      And you wanted people to think that it
 2     was from David?
 3                    A      Right.
 4                    Q      That was the plan –
 5                    A      It had to get out.  There was a
 6     tremendous sense of urgency because Edsel – one of the
 7     clients gave me the letter that Edsel sent.  He said there
 8     was something wrong with this, what's going on here?  And so
 9     I said, I've got to clarify this.  So I sent this thing out
10     but –
11                    Q      What was wrong, Mr. Berge, was that you
12     all were doing something you had agreed not to do; is that
13     what was wrong?
14                    MR. LEFKOVITZ:  Objection (inaudible).
15                    THE COURT:  Sustained.
16     BY MR. KROG:
17                    Q      You and David both understood, didn't
18     you, that you were going to be sending letters to clients
19     over his name?
20                    A      I'm not sure David knew it was going out.
21     He may have.
22                    Q      Well, Mr. Berge, you showed at least one
23     of these letters to David before it was sent, didn't you?
24                    A      Could have.
25                    Q      In fact, you previously testified
```

98

1  that David helped write one of them?  (Video excerpt played
2  in open court.)
3           A     He probably proofed it.
4           Q     It was a joint effort; isn't that what
5  you just testified to, Mr. Berge?
6           A     He could have.
7           Q     And you're referring to these letters
8  that we've just seen?
9           A     Right.
10          Q     So, you and David both knew that there
11  was this effort to represent to people that David was running
12  Realysis Memphis?
13          A     it's his company.
14          Q     It's his company.  And one benefit of
15  being his company was that he didn't have a contract with
16  MarketGraphics, wasn't it?
17          A     You know, I set up those three LLCs
18  anticipating doing a will and estate planning before the
19  termination.  That's why I've got three of them.  One was in
20  my son's name, one was in my wife's and one in mine.  That
21  was the purpose of that.
22          Q     Well, Mr. Berge, you weren't setting up
23  Realysis of Memphis LLC to manage an IRA as part of your
24  estate plan, were you?
25          A     No.

1          Q     You were setting up Realysis of Memphis

2    LLC to transition the home market research business to your

3    son, weren't you?

4          A     In 2009, I started operating as Realysis

5    of Memphis.

6          Q     Well, that's not entirely true, is it,

7    Mr. Berge?

8          A     Wait a minute, wait a minute.  You're

9    twisting this really bad.  I started this in 2009; I did a

10   whole database.  My MarketGraphics of Memphis clients could

11   access the database and they could get a lot of reports they

12   couldn't get from MarketGraphics.  MarketGraphics just didn't

13   meet the stuff available.  They couldn't in some cases, I

14   think.  So they got it free but they were all my

15   MarketGraphics of Memphis clients.  This went on for three

16   years.  And then when I got ready to retire I started talking

17   to Edsel about selling the business and he was unreceptive

18   and refused to give me permission to sell it to anybody else

19   other than David.  So, he put me in a bind.  I got a letter

20   from you, Edsel.

21         Q     Mr. Berge, isn't it true that Realysis of

22   Memphis wasn't even formed until 2012?

23         A     That's correct, Realysis of Memphis, LLC,

24   that's correct.

25         Q     So when you said you'd been

1  doing business as Realysis of Memphis since 2009, that was

2  not the truth, was it, Mr. Berge?

3          A    Yes.

4          Q    Now, Mr. Berge, you had been doing

5  business as MarketGraphics of Memphis.

6          A    That's true but all this information,

7  this whole report was Realysis and that letter I got from

8  Edsel in 2010, he refers to Realysis when we were talking

9  about going to Jackson, Mississippi.  It was well-known; it

10  was Realysis.

11          Q    Mr. Berge, you were providing a

12  supplemental database under the name Realysis, weren't you?

13          A    Correct.

14          Q    You did not produce a written report

15  until 2012 under the name Realysis, did you?

16          A    Right.

17          Q    And that was the first time you did

18  business as Realysis of Memphis, correct?

19               MR. LEFKOVITZ:  Your Honor, please, I'd

20  like to object to the relevancy of this.  What does this go

21  to what Mr. David Berge did or didn't do?

22               THE COURT:  How does this go to what

23  David knew or did?

24               MR. KROG:  I'll move on, Your Honor.

25  BY MR. KROG:

1          Q    Mr. Berge, it's true, isn't it, that you

2    discussed with your son the prospect of being sued by

3    MarketGraphics following your termination, didn't you?

4          A    I told him I might get sued, I suppose.

5    I don't remember, knowing Edsel.

6          Q    And you told your son that he didn't have

7    anything to worry about, didn't you?

8          A    I was under the impression that this is –

9    that the non-complete was incomplete as a clause in the

10   agreement.  It didn't have any time limit, it didn't have any

11   consideration paid for it.  So, I didn't think it was valid.

12         Q    Mr. Berge, one of the reasons that you

13   told your son that he didn't have anything to worry about is

14   that he was the one operating Realysis of Memphis, that

15   everything had his name on it and the story was that you had

16   retired?

17         A    I don't remember telling him he had

18   nothing to worry about.  I don't know.  When did I do that?

19   Where are you getting that?  This stuff is three years old.

20   I'm 72 years old.

21         Q    David knew, didn't he, Mr. Berge, that

22   you were going to be providing or seeking to provide the

23   Realysis of Memphis services to the same people you had been

24   providing MarketGraphics of Memphis services to, correct?

25         A    Yes.  From their standpoint all it

1  was was a name change and a better product coming from the

 2  same source.

 3          Q   David agreed to help you out with the

 4  Realysis business, didn't he?

 5          A   He just did the audit.  He was never

 6  interested, really.  I'm the old man, I was in banking 25

 7  years.  I don't know how many times I've seen somebody who's

 8  the old man, he started a business and wants to push it off

 9  onto his son, and the son isn't all that eager about it.

10  Edsel has probably seen the same thing happen here.  And the

11  old man just keeps trying to get the son to take it over.

12  Sometimes they do and sometimes they don't.  The transition

13  didn't take place because the lawsuit stopped it all.  So, we

14  just kept on doing what we had to do.

15          Q   And Mr. Berge, your son agreed to keep

16  doing it, didn't he?

17          A   The audits.

18          Q   Helping out with the business.

19          A   Doing the audits.

20          Q   Well, I mean it's true, Mr. Berge –

21          A   You're putting words in my mouth and it's

22  not true.

23          THE COURT:  Just let him ask the

24  question.

25          THE WITNESS:  Okay.

1  BY MR. KROG:

2          Q    Mr. Berge, David did more than just the

3  audits, didn't he?

4          A    We talked about him going with me for

5  about five different places.

6          THE COURT:  That didn't answer the

7  question.  Answer the question.

8  BY MR. KROG:

9          Q    Is it your testimony, Mr. Berge, that you

10  never had a discussion with David in which you said in words

11  and substance that because Realysis of Memphis was being

12  operated with the appearance of him as it's owner and

13  president that MarketGraphics wouldn't be able to shut it

14  down?

15          A    I don't remember saying that.  Maybe I

16  did.  I don't know; I don't remember that.  Did I testify

17  that?

18          Q    It would have been a lot easier, Mr.

19  Berge, wouldn't it have, simply to tell people, Hi, I'm

20  Donald Berge, you know me, this is my new company and my son,

21  David, is going to come along to some meetings because when I

22  retire here in a few years he will take over.

23          A    I was hoping to retire a lot sooner than

24  a few years.

25          Q    That would have been a simpler thing

104

1   to do, wouldn't it have been, Mr. Berge?

2                   A    Yes, it would have been your choice.

3                   Q    That would have been more honest,

4   wouldn't it have been, Mr. Berge?

5                   MR. LEFKOVITZ:  Objection.

6                   THE COURT:  Sustained.

7   BY MR. KROG:

8                   Q    Mr. Berge, your conclusion that your non-

9   compete with MarketGraphics was unenforceable was really just

10  an assumption, wasn't it, Mr. Berge?

11                  A    Over the years in banking I've talked to

12  different people, I've been around non-compete agreements, it

13  was more than an assumption.  I felt good about that.

14                  Q    Mr. Berge, didn't you testify that your

15  conclusion was an assumption just a few months ago?  You were

16  deposed by Mr. Glassman in your lawsuit against Mr. Warlick –

17                  A    I didn't –

18                  Q    Mr. Berge, you have to let me ask the

19  question.  You have a lawsuit against Mr. Warlick, do you

20  not?

21                  A    Yes.

22                  Q    You were deposed in that lawsuit by a

23  gentleman named Richard Glassman; your deposition was in

24  December.

25                  A    Well, the way you just said that,

1   you trivialized the word assumption.  Mr. Glassman was not

         2   trivializing it.  That's why I said it's more than an

         3   assumption.  I did not have a legal opinion on it; I assumed

         4   that's what it was.

         5              Q    You testified here in December where you

         6   said, "That was my assumption."  Mr. Glassman asked, "Your

         7   assumption was that without a time limit in it, it was not

         8   enforceable?"  And you answered, "Right."  That was just your

         9   assumption, Mr. Berge.  You're not a lawyer –

        10              A    I'm not a lawyer.

        11              Q    You've never been to law school?

        12              A    Never been to law school.

        13              Q    You didn't pass the bar exam after an

        14   apprenticeship in California?

        15              A    I'm sorry?

        16              Q    You've never passed a bar exam?

        17              A    No.

        18              Q    David never told you, did he, Mr. Berge,

        19   that he objected to the way the Realysis of Memphis business

        20   was being operated, did he?

        21              A    I don't believe so.

        22              Q    He never told you that he wanted out of

        23   that or that he wasn't going to have any part in your efforts

        24   to compete with MarketGraphics?

        25              A    I think he assumed we were going to

                                                                    106

1   keep doing what we had been doing.  He'd been doing it 15

2   years.        Q   And he knew that (inaudible) was being

3   done over his name and not yours?

4             A   Yeah, his name was on - he was a

5   registered agent on that LLC.

6             Q   He was a lot more than a registered

7   agent, wasn't he, Mr. Berge?  We've seen that.

8             A   We didn't call the company.

9             Q   Haven't we seen here today, Mr. Berge,

10  multiple times where you've told us that Realysis was a

11  single member LLC and David is the member?

12           A   We hadn't gotten that far with it.  In

13  other words, it got administratively dissolved by the

14  Secretary State because we didn't do any formation

15  activities.  We didn't file anything, we didn't get any

16  stock, we didn't do any of those things.

17           Q   You don't have any knowledge, Mr. Berge,

18  do you of why LLCs are administratively dissolved by the

19  Secretary of State, do you?

20           A   I think the reason they dissolve it is

21  because there is no subsequent filing after it's registered.

22  There's a time limit on there in which you've got to form the

23  company and have a meeting of the members and get stock and

24  so on.  We didn't do any of that.

25           Q   Isn't it true, Mr. Berge, that

```
 1   your position that Realysis of Memphis LLC was never formed

 2   is a position that you've adopted for litigation purposes in

 3   your case against Mr. Warlick?

 4                A    Say that again, please.

 5                Q    The position that you're espousing now

 6   that Realysis of Memphis LLC was never formed, that's a

 7   position that you've adopted for litigation purposes to

 8   advance your case against Mr. Warlick, isn't it?

 9                A    I don't think so.

10                Q    Because if Realysis of Memphis were a

11   effective entity, it would be the one entitled to most of the

12   damages that you might recover from Mr. Warlick, wouldn't it?

13                A    That's interesting concepts you're

14   throwing at me but you're suggesting that that's what I did.

15                Q    And so this idea that Realysis of Memphis

16   never really existed, despite your testimony to the contrary,

17   that's a (inaudible) rationalization, isn't it?

18                A    At the time I testified it had just been

19   registered and they have like six months or whatever it is to

20   bring it to pass.  We didn't bring it to pass after that

21   testimony.  So, it was in that early stage where we had it

22   registered but there was no stock in the company.  We hadn't

23   done any of that stuff but it still was valid until they

24   administratively dissolve it if we don't do anything with it.

25   But that's what happened.  This is three years ago.  It
```

1    was administratively dissolved sometime after that testimony.

2              Q    Your son knew in September and October of

3    2012 exactly what you were going to do with Realysis of

4    Memphis, didn't he?

5              A    What David knew or what exactly I was

6    going to do with it when I terminated?  I didn't know exactly

7    what I was going to do.  I was going to continue on doing

8    what we were doing.

9              Q    And David knew that?

10             A    Customers knew the name Realysis for

11   three years.  Every time they logged onto the Realysis.com

12   website they were looking at Realysis reports.

13             Q    And David knew -

14             A    And Edsel knew it.

15             Q    And David knew that you all were going to

16   keep doing what you'd been doing, right?

17             A    Yeah, I think so.

18             Q    You talked about it, didn't you?

19             A    I need to remind you David lived in

20   Nashville.  I didn't see him very often.  He would come in

21   for three months, focus on doing - for three weeks, focus on

22   doing the audit, and he was very - it consumed his time.  He

23   would get up and he'd decide where he was going to go and

24   he'd go and do it.  We didn't sit around and chit-chat.  And

25   as soon as he was done with the audit, he was out of

```
 1   there.  He went back to Nashville.

 2                   Q    Well, Mr. Berge, he was at your house in

 3   late September and early October of 2012, wasn't he?

 4                   A    I think so.

 5                   Q    And he was at your house in late October

 6   when you prepared the October 30 client clarification letter

 7   together, wasn't it?

 8                   A    He was probably doing audit work.

 9   October is when we do the third quarter report, audit.

10                   Q    So he wasn't away in Nashville at the

11   time all of this happened in September and October, was he?

12                   A    Well, we do the audit for the third

13   quarter beginning in October.  Now, was he there in

14   September?  I'm not sure.

15                   Q    He was staying in your house in October?

16                   A    In October.  You said September.

17                   MR. KROG:  No other questions at this

18   time, Your Honor.

19                   THE COURT:  Any questions?

20                   MR. LEFKOVITZ:  No questions, Your Honor.

21                   THE COURT:  All right, you can step down,

22   sir.

23                   THE WITNESS:  Thank you.

24                   THE COURT:  Any other witnesses?

25                   MR. KROG:  We're going to call
```

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 110 of 170 PageID #: 1845

```
 1   Ms. Charles, Your Honor.  Do we want to do that or do we want

 2   to eat lunch?

 3                   MR. LEFKOVITZ:  It's up to the Court,

 4   Your Honor.  We can keep plowing on.

 5                   THE COURT:  Let's keep plowing on.

 6                   MR. KROG:  I've been informed that my

 7   client would like at least a short break, five minutes for

 8   people to go to the restroom.

 9                   THE COURT:  Okay, five minutes.

10                        (Brief recess)

11                   THE COURT:  Yes, sir.

12                   MR. KROG:  The Plaintiff calls Paula

13   Charles.

14                        (Witness sworn)

15                   CLERK:  State your full name, please.

16                   THE WITNESS:  Paula Ann Charles.

17   THEREUPON came

18              P A U L A   A N N   C H A R L E S

19   who, having been first duly sworn according to law, testified

20   as follows:

21                   **DIRECT EXAMINATION**

22   BY MR. KROG:

23                   Q    Where is it you live, Ms. Charles?

24                   A    Brentwood, Tennessee.

25                   Q    Where is it that you are employed?
```

                                                              111

```
 1              A    I am the President of MarketGraphics.

 2              Q    MarketGraphics Research Group, the

 3   Plaintiff?

 4              A    Yes, sir.

 5              Q    Were you the President of MarketGraphics

 6   in 2012?

 7              A    Yes, sir.

 8              Q    Have you been the President continuously

 9   since then?

10              A    Yes, sir.

11              Q    If you could briefly describe the

12   business in which MarketGraphics is engaged.

13              A    To scale it down for ease of explaining

14   here, MarketGraphics is a new home market research company

15   that collects specific data that is then processed in the

16   Nashville/Franklin office that produces a variety of charts

17   and graphs, but more importantly, information in such a way

18   that banks, builders, developers, utility companies, a

19   variety of people that are in the new home industry can use

20   the data to determine whether there is over-building, under-

21   building and a variety of other things.

22              Q    And does MarketGraphics study the housing

23   market in Memphis?

24              A    Yes, they do.

25              Q    And the surrounding counties?
```

```
1            A    Yes.

2            Q    And does MarketGraphics put out a report

3    about Memphis?

4            A    Yes, they do.

5            Q    Is Exhibit 51, Ms. Charles, which should

6    be there in the box with you, is Exhibit 51 and example of

7    the report that MarketGraphics produces concerning Memphis?

8            A    Yes, sir.

9            MR. KROG:  Your Honor, I'd like to move

10   Exhibit 51 –

11           MR. LEFKOVITZ:  No objection.

12           THE COURT:  It will be admitted.

13               (Exhibit 51 admitted)

14   BY MR. KROG:

15           Q    Does MarketGraphics collect the data on

16   every housing market itself?

17           A    Can you ask that question again, please?

18           Q    Sure.  Does MarketGraphics enter what are

19   called associate relationships for some markets?

20           A    Some of our MarketGraphics cities, yes,

21   have a licensed associate, while others are what I would say

22   managed out of our corporate office in Franklin.

23           Q    For the markets that you manage, out of

24   your corporate office, who handles the client relationships

25   in those offices for those markets?
```

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 113 of 170 PageID #: 1848

1          A     When it is time to do the client
2   presentations, typically that takes place in the client's
3   offices.  That's done by Edsel Charles.
4          Q     And clients of MarketGraphics directly,
5   right?
6          A     That's correct.
7          Q     Who gets the check if there's an
8   associate?
9          A     The associate.
10          Q     And what is the financial relationship
11   between MarketGraphics and the associate?
12          A     Generally speaking, when a person becomes
13   a licensed associate there is an initial licensing fee.  That
14   fee then comes back to, starting about the second year of the
15   agreement, and then additionally the associate pays for the
16   production of the report, the copying, shipping, so forth.
17   Additionally, one other item is that they pay for the
18   computer processing of the data.  And there are a few other
19   ancillary things.
20          Q     If you would look in the binder that is
21   there in the witness box that should be marked Two, and if
22   you'll turn to Tab 30.  And as we discovered earlier, that
23   binder is missing some tabs, but behind Tab 30 – between Tab
24   30 and 36, are there a number of maps?
25          A     Yes, sir.

1              Q    And looking through these maps, are those

2    maps that were printed in the MarketGraphics report for the

3    Memphis area?

4              A    Yes.

5              Q    And if you turn to the end of that set of

6    maps, are those some of the maps that appeared in the March

7    2012 edition for Memphis?

8              A    Volume 33 that is correct.  I think some

9    of these have come out of the binder.

10             Q    Well, Ms. Charles, aren't the last 10

11   maps or so marked Volume 42, March 2012?

12             A    The volume number is (inaudible).

13             MR. KROG:  Your Honor, we'd like to move

14   Exhibit 35 into evidence.

15             MR. LEFKOVITZ:  No objection.

16             THE COURT:  Be admitted.

17             (Exhibit 35 admitted)

18   BY MR. KROG:

19             Q    And Ms. Charles, the maps we have here

20   between Exhibits 30 and 35 are just the March maps, but were

21   the maps that were published in the other two reports every

22   year substantially identical?

23             A    Yes.

24             Q    The location of the subdivisions and the

25   subdivision data would change?

1        A     Yes and the volume number.  Primarily,

2   those are the only things.

3        Q     Between 2007 and 2012, all of the maps

4   that you produced in the Memphis reports had the copyright

5   legend that we see in the bottom right-hand corner of each of

6   these maps.

7        A     Yes, sir.

8        Q     (Inaudible) the clients and the goodwill

9   associated with the MarketGraphics business, market area

10  where there is an associate?

11       A     While the associate is operating under

12  the terms of the license agreement, they have the

13  relationship with the client.  However, the license agreement

14  states that should the agreement terminate, for whatever

15  reason, there's a number of reasons, that those clients

16  become MarketGraphics clients out of the corporate office and

17  then we would service them.

18       Q     So, an associate does not have the right

19  under an associate agreement to terminate his agreement and

20  compete with MarketGraphics?

21       A     Absolutely not.

22       Q     Do they have the right to use

23  MarketGraphics intellectual property without MarketGraphics'

24  authorization?

25       A     No, sir.

116

1          Q     Did MarketGraphics ever tell Mr. Donald

2    Berge that he could not sell his MarketGraphics of Memphis

3    business?

4          A     No, sir.

5          Q     Did MarketGraphics tell Mr. Berge that he

6    simply could not sell it unilaterally?

7          A     He needed to have –

8          MR. LEFKOVITZ:  Objection, Your Honor.

9    We need to make sure we define which Mr. Berge.

10         THE COURT:  Okay.  Go back.

11   BY MR. KROG:

12         Q     MarketGraphics had an associate agreement

13   with Mr. Donald Berge, correct?

14         A     That is correct.

15         Q     And MarketGraphics never told Mr. Donald

16   Berge that he could not under any circumstances sell his

17   MarketGraphics of Memphis business, correct?

18         A     That is correct.

19         Q     They simply told Mr. Donald Berge that he

20   couldn't sell it without MarketGraphics' consent; is that

21   correct?

22         A     That is correct.

23         Q     Have you seen, Ms. Charles, the Realysis

24   of Memphis report that is there in the box and marked Exhibit

25   51?

1                 A    Yes, sir, I have.

2                 Q    In your experience, would a Memphis

3  client, Consumer Market Research Services, under ordinary

4  circumstances, get both the Realysis report that is marked as

5  Exhibit 51 and the MarketGraphics report that is marked as

6  Exhibit 52?

7                 A    No, sir.

8                 Q    If you'll turn in Binder Two, Ms.

9  Charles, to Tab 39. Is this the email we've heard referenced

10  several times that Donald Berge sent to MarketGraphics on

11  September 28, 2012?

12               A    Yes, sir. At 10 to 5:00.

13               Q    You heard Mr. Donald Berge testify a few

14  minutes ago that the market was audited in October, did you

15  not?

16               A    Yes, I did.

17               Q    Was MarketGraphics' audit done in

18  October?

19               A    Yes, sir; the data was due approximately

20  seven days after the retirement notice came. So, we had to

21  scramble to be prepared to go down there and audit. And

22  being that we audited other markets, we just needed the

23  material to do so.

24               Q    Is it my understanding from your

25  testimony that Mr. Donald Berge didn't send you the data

```
 1    for that fall audit report, did he?

 2              A    We ended up getting a portion of the

 3    data.  There was a portion that we never received.

 4                   MR. KROG:  Your Honor, I'd like to move

 5    Exhibit 39 into evidence.

 6                   MR. LEFKOVITZ:  No objection.

 7                   THE COURT:  Be admitted.

 8                   (Exhibit 39 admitted)

 9    BY MR. KROG:

10              Q    Did MarketGraphics agree to the

11    termination of the associates agreement that Donald Berge

12    requested in Exhibit 39?

13              A    Yes, we did agree.

14              Q    If you'll turn to Tab 41, Ms. Charles.

15    Is Exhibit 41 an email that you sent?

16              A    Yes, it is an email that I sent.

17              Q    To Mr. Donald Berge on October 1, 2012?

18              A    Yes, sir.

19              Q    Was the attachment to that email Exhibit

20    42?

21              A    Yes, I believe so.

22                   MR. KROG:  Your Honor, I'd like to move

23    Exhibits 41 and 42.

24                   MR. LEFKOVITZ:  No objection.

25                   THE COURT:  They'll be admitted.
```

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 119 of 170 PageID #: 1854

```
 1                    (Exhibits 41 and 42 admitted)

 2    BY MR. KROG:

 3              Q      And on the second page of this October 1,

 4    2012 letter, Ms. Charles, did you and Mr. Edsel Charles

 5    expressly remind Mr. Donald Berge about the non-compete

 6    provision in the associate agreement?

 7              A      Yes, sir.

 8              Q      Over the course of October 1 and 2 and 3,

 9    did you and other employees at MarketGraphics exchange other

10    emails with Mr. Berge?

11              A      Yes.

12              MR. LEFKOVITZ:  Again, Your Honor, let us

13    reflect that they're referencing Mr. Don Berge.

14              THE COURT:   Right.

15    BY MR. KROG:

16              Q      Those were emails with Mr. Donald Berge.

17              A      Correct.

18              Q      If you look at Exhibits 43, 44, 45, 46

19    and 47, are those emails that MarketGraphics and Mr. Donald

20    Berge exchanged during this period?

21              A      Yes.

22              MR. KROG:   Your Honor, I'd like to move

23    Exhibits –

24              MR. LEFKOVITZ:   No objection to all of

25    those.
```

```
 1                    MR. KROG:  43 through 47.

 2                    THE COURT:  They'll be admitted.

 3                         (Exhibits 43 through 47 admitted)

 4   BY MR. KROG:

 5              Q     In any of those communications, Ms.

 6   Charles, did Mr. Donald Berge inform MarketGraphics that he

 7   was going to continue operating a market research business?

 8              A     No, he did not.

 9              Q     Or continue working with a market

10   research business?

11                    THE COURT:  It sounds like he's having a

12   short there, can you hear?

13                    MR. LEFKOVITZ:  I'm hearing a background

14   hum.

15                    MR. KROG:  I think the doc cam, Your

16   Honor.  I think the doc cam is trying to focus, I believe,

17   Your Honor.

18   BY MR. KROG:

19              Q     Ms. Charles, Mr. Donald Berge never

20   informed you in any of the communications you exchanged with

21   him between October 1 and October 3 that he was going to

22   continue working with a market research business in Memphis,

23   did he?

24              A     He did not.

25                    THE COURT:  Ma'am, did you have
```

1    a conversation prior to the lawsuit with David Berge?

2                        THE WITNESS:  Yes.

3                        THE COURT:  Okay, go ahead.

4    BY MR. KROG:

5                Q     What kind of conversations did you have

6    prior to the lawsuit with Mr. David Berge?

7                A     He attended what we call a MarketGraphics

8    Associates Summit.  That's one that comes to mind.  And what

9    that is is a meeting for all of our licensed associates and

10   those, some of those out of the corporate office, to meet.

11   And we would meet at a variety of places in the U.S. and

12   discuss the details of MarketGraphics and maybe new products

13   that we were coming out with or a new way of evaluating the

14   data that we might put in the reports, and a lot of other

15   internal information.

16                Q     Did MarketGraphics place Mr. David Berge

17   on its associate communication email list?

18                A     Yes.

19                Q     Do you recall when MarketGraphics placed

20   Mr. David Berge on that list?

21                A     I don't remember.  I'm just going to

22   guess 2005, 2006.

23                Q     Before 2010?

24                A     Absolutely.

25                Q     If you would look, Ms. Charles,

                                                              122

1  at Exhibit 48, can you identify Exhibit 48 for us?

2                    A    Yes, it's a letter that we sent to all

3  the MarketGraphics Memphis clients that explained that Don

4  was retiring.  And while we did that we also took the

5  opportunity to explain that we had changed the format of our

6  reports to a spiral bound.  We also offered additional

7  mapping products for them, so we detailed that there.

8                    Q    Did anything Mr. Donald Berge had

9  communicated to MarketGraphics before 2012 give

10  MarketGraphics the impression that Mr. Donald Berge had not

11  retired?

12                    A    Can you ask that again, please?

13                    Q    Did Mr. Donald Berge tell MarketGraphics

14  prior to the time this letter was sent that he was retiring?

15                    A    No, this was the first time I'd heard he

16  was retiring.

17                    MR. KROG:  Your Honor, we would move

18  Exhibit 48 into evidence.

19                    MR. LEFKOVITZ:  No objection.

20                    THE COURT:  It will be admitted.

21                    (Exhibit 48 admitted)

22  BY MR. KROG:

23                    Q    Ms. Charles, if you would please look at

24  Exhibit 49.  Can you identify Exhibit 49 for us?

25                    A    Yes.  What transpired after

123

1 the retirement notice and us scrambling to make sure we had

2 the market data available in time for the clients, it came to

3 our attention that, while talking to the clients and trying

4 to explain the transition, that, in fact, Don wasn't retiring

5 and that the business was continuing under a different name.

6 So, in this letter we stated parts of our associate

7 agreement, reminding him of confidentiality, copyright and so

8 forth.

9          Q    And one of the parts that you were

10 reminding him of was the part that we see credited on the

11 second page, isn't it, that you had a non-compete agreement

12 with him, correct?

13          A    Absolutely.

14          Q    Did you receive an answer, Ms. Charles,

15 to Exhibit 49?

16          A    Yes, we did.

17          MR. KROG:  I'd like to move Exhibit 49

18 into evidence, Your Honor.

19          THE COURT:  It will be admitted.

20          (Exhibit 49 admitted)

21 BY MR. KROG:

22          Q    Is the answer you received, Ms. Charles,

23 what we've marked as Exhibit 50?

24          A    Yes, sir.

25          MR. KROG:  I'd like to move Exhibit 50 —

124

```
 1                    MR. LEFKOVITZ:  No objection.

 2                    THE COURT:  Be admitted.

 3                    (Exhibit 50 admitted)

 4    BY MR. KROG:

 5                    Q    And the letter that is the second page of

 6    Exhibit 50, Ms. Charles, was attached to the email that is

 7    the first page?

 8                    A    Yes, sir.

 9                    Q    Does Mr. Donald Berge make any reference

10    in here to carrying on business as Realysis of Memphis?

11                    A    A quick glance here I would say no but

12    I'd have to read all of the lines of it to answer that

13    thoroughly.

14                    Q    Just take the time to read it, Ms.

15    Charles, and tell me whether or not Mr. Donald Berge

16    communicated by this letter that he was working with a

17    business that was continuing to sell market research services

18    in Memphis.

19                    A    No, it does not say he has a continuing

20    research company but now after all that's happened I guess we

21    could have read into the last points where it says his

22    clients he would not share what the financial dealings were

23    but at the time it didn't seem to be clear.

24                    Q    In fact, MarketGraphics needed to know

25    the financial arrangements that Mr. Donald Berge had, what
```

1    MarketGraphics of Memphis had, so that it knew what to charge

2    the clients in Memphis, right?

3                    A    Yes, we wanted to honor the same price.

4                    Q    Did Donald Berge send you those?

5                    A    No, he did not.

6                    Q    If you'll look at Exhibit 70, Ms.

7    Charles.  Is this a document that MarketGraphics received in

8    the fall of 2012?

9                    A    Yes.

10                   Q    Was this document one of the first

11   confirmations that MarketGraphics had that Realysis of

12   Memphis was providing market research services to Memphis

13   area clients?

14                   A    I don't remember if this invoice came

15   before the phone conversations that we were having with the

16   clients, or in the middle of that.  It all happened at the

17   same time.

18                   MR. KROG:  I'd like to move Exhibit 70 –

19                   MR. LEFKOVITZ:  No objection.

20                   THE COURT:  It will be admitted.

21                        (Exhibit 70 admitted)

22   BY MR. KROG:

23                   Q    Is Exhibit 71, Ms. Charles, a similar

24   document?

25                   A    Yes, that would be the invoice that

126

1  would have come from our office.

2                    MR. KROG:  I'd like to move Exhibit 71

3  into evidence, Your Honor.

4                    MR. LEFKOVITZ:  No objections.

5                    THE COURT:  Be admitted.

6                    (Exhibit 71 admitted)

7  BY MR. KROG:

8                    Q    Ms. Charles, if I wanted to find out what

9  injury to Realysis Memphis enterprise inflicted on

10  MarketGraphics, where would I look to find that out?

11                   A    I would calculate it and put it on a

12  different legal document between the court systems.

13                   MR. LEFKOVITZ:  Your Honor, I would

14  object to that.  There's already been an entry of a judgment

15  from the District Court, so there's been a determination of

16  the amount of damages.

17                   THE COURT:  The injury, yes.  A

18  determination of the amount of the injury; whether or not

19  that still qualifies as anything against Mr. David, I don't

20  know.

21                   MR. LEFKOVITZ:  I don't know.  I just

22  bring it up that they have a judgment in the District Court

23  and they filed a proof of claim.

24                   THE COURT:  Well, it's a judgment against

25  David in the District Court and I would think that would

127

1  be the amount of the injury that the Court found.

2              MR. LEFKOVITZ:  That's correct, Your

3  Honor.

4              THE COURT:  Is that correct?

5              MR. KROG:  That is what I was going to

6  ask the witness to testify to, Your Honor.

7              THE COURT:  We don't even need to go

8  there.  Just District Court found there was this much injury

9  done to MarketGraphics.

10              MR. KROG:  No other questions at this

11  time, Your Honor.

12              THE COURT:  Mr. Lefkovitz?

13              MR. LEFKOVITZ:  Thank you, Your Honor.

14  I have two questions, maybe one-and-a-half.

15                    **CROSS-EXAMINATION**

16  BY MR. LEFKOITZ:

17              Q    In response to Judge Harrison's question

18  earlier about your conversations with Mr. David Berge, you

19  said that those were at the MarketGraphics Summit.  How often

20  are those held?

21              A    Every year.

22              Q    Do you recall –

23              A    Before the recession.  When the recession

24  hit we didn't do them.

25              Q    So, would you say the last one was

```
 1   in 2008, 2009 - do you recall when this last -

 2               A     I couldn't with any accuracy.

 3               Q     But it would be a period before the

 4   lawsuit?  These were annual events.

 5               A     It was before the lawsuit.

 6               Q     And before Don Berge terminated his

 7   relationship with you all?

 8               A     Yes, it was before.

 9               MR. LEFKOVITZ:  Thank you.

10               THE COURT:  Anything else?

11                     REDIRECT EXAMINATION

12   BY MR. KROG:

13               Q     The summits, Ms. Charles, that Mr.

14   Lefkovitz just asked you about, those concerned

15   MarketGraphics market and research business, correct?

16               A     Correct.

17               Q     And that business was the business that

18   Mr. Donald Berge was engaged in by an associate agreement

19   with MarketGraphics of Memphis, correct?

20               A     That is correct.

21               Q     And that's, essentially, the same

22   business that Realysis of Memphis was engaged in?

23               A     Yes, sir.

24               MR. KROG:  That's all.

25               MR. LEFKOVITZ:  No Redirect.
```

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 129 of 170 PageID #: 1864

1    THE COURT:  You can step down then, thank

2    you.  Next witness.

3    MR. KROG:  Your Honor, we are out of

4    witnesses.  We do not have any further witnesses.

5    THE COURT:  All right, Mr. Lefkovitz?

6    MR. LEFKOVITZ:  We stand on our proof,

7    Your Honor.

8    THE COURT:  All right.  You want to make

9    closing arguments?

10    MR. KROG:  I would like to make a closing

11    argument, yes, Your Honor.

12    THE COURT:  All right.  You come on up

13    and I've got some questions for you.  I'm going to let you do

14    your argument but I want to ask a couple questions first.

15    Where in the proof that we've heard today

16    is there any indication that David intended to cause injury

17    to MarketGraphics?

18    MR. KROG:  Well, Your Honor, David knew

19    that his father was, that the Realysis of Memphis business

20    was soliciting and serving the same clients that they had

21    served as MarketGraphics of Memphis.  He knew that they were

22    going to try to get those same clients for Realysis.  He

23    knew, he testified that it wasn't likely that they were going

24    to get both MarketGraphics and Realysis and he's testified

25    that, well, what he was making depended upon how well the

1    business was doing.  He made $6000 to $10,000 a cycle, and

2    the better the business was, the more he made, and that they

3    were going to go out and try to get these same clients, the

4    clients that MarketGraphics had reserved to itself through

5    its agreement with Mr. Donald Berge.

6                        And so, while he might have had the

7    desire, I think the Court can conclude, based on the

8    testimony, that he desired the customers to come over to

9    Realysis because it mean money in his pocket and it put money

10   in his dad's pocket, in order to help his father.

11                       The Court can also conclude, easily, that

12   he knew that was substantially likely to result.  And as we

13   saw at the beginning today, intent is either desire or it's

14   knowledge of the substantial likelihood of an outcome.  And

15   so Mr. Berge knew (inaudible) working with his dad and the

16   efforts that they were doing that those clients were going to

17   stay, a lot of them were going to stay with the Berges when

18   they went to Realysis.  That's how these things often go.

19   You have the face of a business and when you leave and go to

20   another business, the people who know you go with you.

21   That's why non-compete exists and are enforceable.  Mr. Berge

22   knew that was substantially likely to happen.

23                       And so the Court can look at that and

24   say, well, that is willful infliction of injury because he

25   intended under this desire or knowledge of substantial

1  certainty, those customers to leave the business to which

2  they had been contractually reserved and to go to our

3  business and to use our business, not the old business, not

4  the business to which they were contractually reserved.

5              So, I think that proof, Your Honor, goes

6  to the intent. And it's my understanding from the beginning

7  things Mr. Lefkovitz said, that they weren't even contesting

8  willfulness.

9              THE COURT: Well, they're two things,

10  willfulness and maliciousness.

11              MR. KROG: Very true, Your Honor, but –

12              THE COURT: They're not the same thing in

13  any of the cases.

14              MR. KROG: They aren't the same thing,

15  although the willfulness is evidence of the malice because

16  malice is ill will or spite. What malice is, malice is

17  simply acting with conscious disregard of the rights of

18  others or without just cause or excuse. And Mr. David Berge

19  testified that he consciously disregarded the fact that what

20  they were doing would inflict injury on MarketGraphics. So,

21  that right there is the conscious disregard. And that's a

22  disjunctive test under malice.

23              You can have conscious disregard or you

24  can have without just cause or dispute, just cause or excuse.

25              THE COURT: Well, the Geiger Case

1   says unless the actor desires to cause the consequences of

 2   his act or believes that the consequences are substantially

 3   certain to result from that.

 4                        MR. KROG:  Correct, Your Honor.  And the

 5   Markowitz Case says that's what willful means.  They're using

 6   that restatement section 8A definition of intent and applying

 7   that to willful.  So Markowitz and Geiger are very clear that

 8   that is what willful means.  Willful means intent; intent

 9   means I desire it or I know it's substantially likely to

10   happen.  That's the willfulness of it.

11                        This malice question is whether you have

12   a just cause or excuse when you act with conscious disregard.

13                        THE COURT:  Well, what did he consciously

14   disregard?

15                        MR. KROG:  Well, Your Honor, he

16   consciously disregarded the risk of injury, the injury that

17   was occurring to MarketGraphics.  He said he would follow his

18   dad and participate in his dad's business if they took one

19   client or if they took all the clients of MarketGraphics.

20   But the fact that it was taking money, that it was injuring

21   MarketGraphics' business was not of a concern to him.

22                        And we can go back and look, and he

23   expressly said, I asked him, you consciously disregarded that

24   injury to them, didn't you?  He said yes.

25                        THE COURT:  I don't remember

                                                              133

1    that question being put like that.

2                    MR. KROG:  I can't say that I wrote it

3    down at the time, Your Honor, or could cite it back

4    precisely.  But we could also look at the just causes or

5    excuses.  And I haven't heard or seen in the paper a real

6    clear articulation of what just cause or excuse the Defendant

7    is relying on here.  The main one that I heard from Mr.

8    Berge's testimony, Mr. David Berge's testimony, is the first

9    one we have highlighted here, that he did it for his father.

10   And the problem, Your Honor, is that this familial loyalty

11   justification is not a just cause or excuse.  It was

12   expressly rejected in the In re: Bammer case, Ninth Circuit

13   Court of Appeals Case, applying actually a more rigorous

14   maliciousness test, the one that incorporates the just cause

15   or excuse element.

16                   And in Bammer, Bammer's mother had been

17   convicted of embezzlement.  She had ripped off hundreds of

18   thousands of dollars from –

19                   THE COURT:  Did what for Dad?  What did

20   he do that you're saying he did for dad?

21                   MR. KROG:  Well, he participated in the

22   Realysis of Memphis business.  He kept on working with this

23   business and he was an integral part of it.  Donald Berge

24   needed him to drive the market.  He did the research, he went

25   out and drove large parts of the market, keyed in all of the

134

1   data entry, 90 to 100 percent of the data entry. He let his

2   father put out all the Realysis of Memphis stuff with his

3   name on it, knowing at the time that his father had a non-

4   compete agreement and that he hadn't signed it, and that they

5   were likely to get sued over it. And his justification is,

6   my father needed help. And I won't argue with the fact that

7   Donald Berge needed David Berge's help to operate the

8   Realysis of Memphis business. That's the case.

9                 But his loyalty to his father was not a

10   justification for helping his father operate in violation of

11   his covenant against competition and coaxed customers away

12   from MarketGraphics in the process. That defense of it was

13   out of compassion for my parents was rejected in the Bammer

14   Case where a son engaged in a number of fraudulent transfers

15   to encumber his mother's assets and inflate them against a

16   embezzlement just.

17                 THE COURT: And he knew what he was

18   doing?

19                 MR. KROG: He knew what he was doing.

20                 THE COURT: Now, did Donald know, given

21   his father's testimony, about when would his father say he

22   talked to lawyers and the non-compete was valid, was invalid.

23                 MR. KROG: I believe Donald Berge

24   testified that he had heard from bankers and other people

25   over the years and that he hadn't actually consulted an

135

1  attorney specifically about this topic, or what they were

2  going to be doing that's admissible.

3            Mr. David Berge did testify that he knew

4  about the non-compete, that he knew it was in there and he

5  knew at least by the October 5 letter from MarketGraphics

6  that MarketGraphics was going to attempt to enforce it.  And

7  the law is, if you know about contracts like that, you don't

8  get to say, oh, well, maybe that's enforceable, maybe it's

9  not.  I'm going to say it's not and go ahead.  And was

10  essentially ignorance of the law defense and we cited several

11  cases on that, one of which is the Wierenga Case.  Mr.

12  Wierenga had a house that was being foreclosed on and he and

13  his wife, they went and they took most of the fixtures out of

14  the house.  Then when the bank sued them for damaging the

15  house, taking the fixtures out, they said, oh, well, we

16  thought we owned those things and that we could take them

17  with us.

18            THE Bankruptcy Court, in finding that the

19  liability for removing those fixtures was nondischargeable,

20  said, you know, that's an ignorance of the law defense.  That

21  doesn't work.  It's not a defense civilly, it's not a defense

22  criminally, and it's not a justification or excuse under

23  523(A)(6).  You know, you knew you were taking these things

24  out of the house and that you were damaging the house in the

25  process.  So, the fact that you were mistaken about

136

```
 1  the lawfulness, that doesn't insulate you.

 2                      The same is true, Your Honor, in - the

 3  exact same thin is true in these commercial contract cases.

 4  You know there's a contract out there with a non-compete

 5  provision and you know you're doing business with a party to

 6  it, you act at your own peril.

 7                      We had a case a couple of years ago

 8  across the street in front of Magistrate Judge Griffin with

 9  exactly the same facts from the tort side.  And the Defendant

10  in that case said, oh, well I knew that this guy had a non-

11  compete and I knew I was on the list but golly gee, you know,

12  I thought we had it set up so we weren't breaching that

13  agreement.  And, therefore, my acts weren't malicious and I'm

14  not guilty of this tort of interfering with the contractual

15  relations.

16                      And Magistrate Griffin, based on the

17  great and rebutted weight of authority said, "That is not how

18  the law works."  If you know that what you're doing is taking

19  sales, taking customers away from the other party of this

20  agreement who has reserved those rights to himself, you don't

21  get to simply decide, on advice or without advice of counsel,

22  that what you're doing is okay.  You act at your own risk.

23  And that's malicious.  And so we've seen that rejected here

24  by this Bankruptcy Court.  We also cite the Sark Case, Your

25  Honor, in which Mr. Sark said, well, I had an attorney.  I
```

thought my competition in this case, with my former employer, was lawful because my attorney said I could do this.

The Bankruptcy Appellate Panel for the Sixth Circuit, in Sark said the great weight of authority is that arguments like that aren't a defense to maliciousness.

And one of the reasons that neither family loyalty nor ignorance of law are defenses to maliciousness, they don't prevent the act from being malicious, is that the party implicated by this conduct is the Plaintiff, the creditor. And neither well, I feel compassion or I feel compelled to obey my parents nor, well, I just didn't know that was against the law, neither of those are excuses that involve the Debtor having any concern for the rights of the Creditor.

There are some cases that we've seen where a party goes out and, you know, sells collateral, for instance, in violation of a security agreement, and the Debtor comes in and says, well, you know, I knew it was wrong to sell that stuff. I really thought that if I did it I could use the revenue to keep the business going and pay off the creditor. The creditor-oriented excuse. And then the justifications that Mr. Berge has been advancing here are creditor-oriented.

And so for those reasons, Your Honor, we think that conduct counts. You know it counts as malicious;

these excuses aren't. We also have the "I wasn't involved."
I did the audit, I did my thing and then I was out. And I
wasn't driving the bus; I wasn't driving the wagon. That's
also a defense that has been rejected. I mean it leans more
to willfulness but the Bankruptcy Courts have been very clear
that if you have knowledge of the enterprise and you have
knowledge that the enterprise is inflicting an injury on
someone else, you don't have to be in charge. You just have
to participate.

And so we have the Draiman Case in which
the principal mover in the unfair competitive scheme was the
debtor's husband. You were involved, you were a member of a
conspiracy, you acted in concert with your husband, and so
his misconduct is imputable to you. Not just for purposes of
tort liability but for purposes under 523(A)(6). And that's
one of the reasons, Your Honor, why we've looked a lot today
at what Mr. Donald Berge did, because Mr. David Berge was
involved in that undertaking, he was involved in that
undertaking, he was involved in the business, he knew how it
was being operated, and in District Court, we look at that
Court's judgment. The District Court found that Mr. Berge,
David Berge, had been acting, in Judge Trauger's words, "in
active concert with Donald Berge."

(Away from microphone) the Defendant
David Berge and the LLC have been acting in (inaudible)

1 active concert with Donald Berge since Donald Berge's

2 termination of the associate agreement. The actions of the

3 (inaudible).

4        Frankly, Your Honor, the case law is

5 starker than the language Judge Trauger uses because there

6 are a number of cases where much less than acts in concert

7 suffices to hold the subordinate member of the wrongful

8 undertaking liable for the undertaking's debts.

9        There are a number of cases cited, Your

10 Honor, including the 11th Circuit 2012 case, in re: Jennings,

11 Maxfield versus Jennings, where the tortfeasor's ex-wife

12 executed a deed to a piece of property because the tortfeasor

13 asked her to, and it was a fraudulent transfer. And the 11th

14 Circuit says, well, because you knew that there was no good

15 reason to make that conveyance, and you knew there was this

16 creditor over here who was getting stiffed, you're on the

17 hook, under 523(A)(6) for participating in the scheme, even

18 though you weren't the original tortfeasor and you're not the

19 prime mover or player in this undertaking.

20       Iwas (phonetic) versus Cunningham 2012

21 6th Circuit Bankruptcy Appellate Panel case is similar. The

22 Cunninghams were a married couple. Mrs. Cunningham embezzled

23 hundreds of thousands of dollars from her employer, which Mr.

24 Cunningham withdrew from the bank and spent. And Mr.

25 Cunningham, when he was sued for nondischargeability in

1   Bankruptcy, said my wife is the embezzler.  How was I

2   supposed to know where the money came from?  You know, it was

3   a little heavy on the pockets.  And the Bankruptcy, Appellate

4   Court, said, again, that is not how this works.  You knew

5   from your knowledge of your family's finances that this money

6   didn't come from a paycheck, either for yourself or your

7   wife.  You knew you had way more cash in the bank than you

8   earned, and you took it out and dissipated it.  And that's

9   malicious injury under 523(A)(6).

10                    There was also some talk in Mr. Berge's

11  trial brief and some reference in testimony to the idea that

12  perhaps Mr. Warlick didn't do a good job.  The problem there,

13  Your Honor, is two-fold.  One, Mr. Warlick wasn't involved

14  until after they had already started all this.  And so the

15  intent that they formed in October in carrying through the

16  Realysis business was not something Mr. Warlick had any

17  involvement at all.  The record will reflect that the

18  associate agreement was terminated on September 28, 2012,

19  that Realysis of Memphis was already putting out its hook for

20  it by that time.  They were invoicing clients on September

21  24.  The exchange of letters between MarketGraphics and Mr.

22  Donald Berge, of which Mr. David Berge had knowledge, was in

23  the first week of October and they don't hire Mr. Warlick

24  until sometime after MarketGraphics filed suit against them

25  on January 2, 2013.

1        And the problem, to the extent that this
2   could be a defense at all, is that it just isn't.  The Court
3   in the Couch Case, Bankruptcy Court, said that Couch is
4   accountable for the acts and omissions of his counsel, even
5   if Couch might have reason to blame counsel.
6        So, even if we were to posit and admit
7   that, you know, Mr. Warlick did a bunch of stuff wrong, and
8   even if it were relevant, it's not a defense here because it
9   doesn't go to whether or not Mr. David Berge acted without
10  just cause or excuse, and the things that he did in the
11  District Court action, if those were wrong that's between Mr.
12  Warlick and Mr. Berge.  Mr. Berge is stuck with it.
13       Your Honor, Mr. Lefkovitz asked Mr. David
14  Berge if he would have done all this if his father had told
15  him that it was unlawful and that they were going to be
16  stopped.  Mr. Berge said, "No."  Those were the only two
17  questions Mr. Lefkovitz asked Mr. Berge.  And, again, that's
18  a mistake of law, Your Honor.  People can make mistakes of
19  law and be prosecuted and sent up the river for a long time
20  for doing something you didn't know was illegal.  And the
21  Bankruptcy Courts agree in the 523(A)(6) context.  We
22  mentioned the Weirenger Case, the Deportis Case from the
23  Southern District of Illinois, we cited in our brief.
24  (Inaudible) the In re: Glenn Case in 2012, very similar facts
25  to Weirenger.

1    We also saw, Your Honor, that Mr. Berge

2    was very aware of the maps that he used to drive the market

3    for MarketGraphics.  And if we look at the exhibits, Your

4    Honor, that were admitted and stipulated, one of the

5    principal copyright violations, Your Honor, was that several

6    of those maps had been copied over into the Realysis report,

7    the areas were almost or substantially identical in the words

8    of the copyright law.  And the District Court found that Mr.

9    Berge's infringement in that regard was willful.  And we

10   submit, Your Honor, that the willfulness determination by the

11   District Court is preclusive on the willfulness prong here

12   because, as we discussed in the 6th Circuit case, the

13   Princeton University Press case, willfulness in the copyright

14   act means intent to infringe, not just intent to copy but

15   intent to infringe, knowledge that the copying constitutes

16   infringement.

17              And so the District Court has already

18   determined that Mr. Berge intended to infringe, he knew the

19   copyright, he knew those maps were copyrighted by

20   MarketGraphics and he was culpable for his involvement in

21   infringing them with the Realysis reports, knowing that the

22   copying was infringement.

23              And even if that weren't preclusively

24   established, Your Honor, we submit that the Court could

25   easily conclude that Mr. David Berge knew the maps were

copyrighted because he started at them for hours at a time, days at a time, for years, driving the car. He couldn't deny that at some point over that time he'd seen the copyright notices and that he knew it was copyrighted. He didn't have a specific recollection of having seen the copyright notices but I think Your Honor would be well-justified in concluding that if you stare at the maps hours at a time, eight to 12 hours a day for three weeks at a time, that at some point you're going to notice everything that's on them.

There was also in this case, Your Honor, an open question regarding the extent of the proclusion flowing from the District Court's judgment, something Your Honor didn't rule upon in the summary judgment stage, as to whether or not the District Court judgment decided the common law claims that MarketGraphics had asserted against Mr. David Berge.

Mr. Berge has asserted that because the judgment doesn't refer to those claims expressly, and expressly say judgment is hereby entered for MarketGraphics on the account of intention interference with business relations that those claims were not decided by the judgment. And that's simply not the case, Your Honor.

So, we cited a very stark articulation of the rule of the interpretation of judgments in preclusion cases. There was a case a few years ago out of Fifth Circuit

1 actually, Miller versus Nichols, where somebody made the same
2 argument. Well, that's not mentioned (inaudible) in the
3 judgment, so it wasn't decided. And Miller versus Nichols
4 says that is not the law. The exact quote, "That is not the
5 law."
6                         And the Sixth Circuit has told courts,
7 Bankruptcy Courts, that when you have this preclusion
8 question you have to look at the record as a whole. And one
9 of the things we have in the record from the District Court
10 case, we've introduced here, Your Honor, is our local rule
11 7.01. And if Your Honor (inaudible) the exhibits that have
12 been introduced from the District Court record, you'll see
13 that there was a motion for summary judgment filed. There
14 was then a - there was no response filed. It was a motion to
15 continue, a motion to (inaudible) time to respond. There was
16 no response filed to the motion for summary judgment. And
17 after the response deadline passed, we filed this local rule
18 7.01 (inaudible). And local rule 7.01 across the street,
19 Your Honor, of course, is the rule that says you don't oppose
20 a motion that's consented to and it will be granted.
21                         And in this motion, Your Honor, we ask
22 the Court precisely what we were hoping it would do in its
23 summary judgment ruling. And so on the second page is a very
24 nice little chart saying that the Plaintiff requests
25 (inaudible) against all the Defendants in the following

1   amounts, and we reference the various counts.  And these were

2   the counts that remain pending against Mr. David Berge at the

3   time of this motion, the time of the summary judgment motion,

4   the local rule 7.01 motion.  And six, 11 and 12 were the

5   claims for the common law claims.  And Count 10 is the TCA

6   claim.  And those are all on the one line with the $72,328

7   because the damages were (inaudible).  They weren't

8   independent damages.  They replicated one another.  And also

9   because (inaudible) entitles you to treble damages if the

10  violations are willful, and the District Court found it was.

11  And so the additional amount from the trebling is there on a

12  second line.

13              When we look at the judgment, Your Honor,

14  we see the same (inaudible).  Instead of being referenced by

15  counts, it's referenced by the type of damages.  And there is

16  the first line, just like it was in the 7.01, is copyright

17  damages, and then there were all the other compensatory

18  damages.  And then the third line is these treble damages but

19  those aren't compensatory, that's a punitive amount.  And

20  then prejudgment interest.  And when we filed the form of the

21  judgment, we left that last line (inaudible) interest after

22  August 5, we left that blank because we didn't know how long

23  Judge Trauger would take to enter the judgment, and she took

24  a few days and her office entered the number, $336.94.

25              And just for good measure, we had

a second a chart on that local rule 7.01 measure attached to

the end that broke it down once again for Judge Trauger, with

both the account name and the account numbers.  And we see,

again, the accounts, the compensatory damages for the common

law claims and the compensatory element of the TCA are lumped

in here under the same 72,328 number.  That was the way we

presented that throughout the papers to make it clear to the

District Court that we were requesting that number once, that

we weren't entitled to get 72,328 times all those claims, but

those damages were (inaudible) that yielded the same damages.

And so, Your Honor, when Judge Trauger entered her judgment

that has a very similar table, she's, you know, replicating

carrying over that request that she is granting to enter a

judgment on all these other compensatory claims in this

72,328 amount.

And she actually goes on later in the

judgment to talk about things and facts that don't relate

either to the copyright claim or the TCA claim.

If we look at Paragraph 8, we have

Paragraphs 8 and 9, Your Honor, and we see that the

Defendants against whom the judgment is being entered are

enjoined from acting in concert or (inaudible) with or on

behalf of Donald Berge and doing certain things related to

market research in the Memphis Metro area.  And those,

obviously, Your Honor, are injunctive instructions related to

1   the unfair competition, the conspiracy and the interference

2   with business relations elements of our claims.  This is not

3   TCPA relief and it's not related to the copyright claim that

4   was asserted because of a separate multi-phase (inaudible)

5   injunction against the infringement that we scrolled through

6   before.  In other words, that's not in dispute but that's in

7   there.

8                    And then there's this other equitable

9   relief related to the common law claims.  We looked at

10  Paragraph 3 previously, at the Defendants, including David

11  Berge acting in concert with Donald Berge since Donald

12  Berge's termination of the associate agreement.  That's

13  clearly a finding related to unfair competition and the

14  conspiracy claims.

15                   And, again, in Paragraph 4, that they

16  wrongfully impaired Plaintiff's goodwill among its customers

17  and deprived it of the opportunity to compete fairly.  That's

18  not copyright act relief, Your Honor, that is common law

19  relief related to the common law claims that we had.  And the

20  same is true under Paragraph 12, related to trademark issue

21  that wasn't even being asserted directly against Mr. David

22  Berge because the registrant of the infringing website that

23  we need to talk about here today.  That was Donald Berge and

24  that claim was asserted as discussed in the local rule 7.01

25  motion and motion for summary judgment that was asserted

against Mr. Donald Berge. But Judge Trauger finds that they benefited from that infringement of trademark and participated in it.

Again, Your Honor, that's unfair competition and that's conspiracy. It's not copyright infringement and it's not (inaudible) relief.

Finally, Your Honor, the judgment can't be related solely to the copyright claim and the TCA claim because Judge Trauger certified the judgment as final under Rule 54(B). And the record is clear and it's stipulated that there were other claims still pending against Mr. David Berge when the judgment was entered. There were other parties, Martha Berge and Donald Berge, as to whom no judgment at all was entered at that time. The case was stayed as to them. They'd already filed Bankruptcy.

So, in order for Judge Trauger to certify the judgment as final under Rule 54(B), she had to resolve the whole case against Mr. David Berge. She had to resolve all the claims. Now, we've abandoned a couple of those claims; those claims go away. And other claims she entered judgment in the Plaintiff's favor, as it had been requested in summary judgment motion that she granted and in the local rule 7.01 motion, pursuant to which she entered the judgment. She couldn't have left those claims hanging, they had to go somewhere. There is nothing in the judgment that

149

1    suggests they've been dismissed.

2                    Mr. Lefkovitz has never provided any

3    authority for the proposition that Judge Trauger could simply

4    leave them in limbo.  And the case law is very clear that if

5    you've got a Rule 54(B) judgment it has to adjudicate all the

6    claims against at least one defendant, the defendant against

7    whom the judgment is being entered.  All the claims as to at

8    least one party or one claim as to all parties.  And it

9    clearly adjudicates any claim as to all the parties because

10   Donald Berge and Martha Berge were stayed.  The Judgment

11   expressly (inaudible) doesn't operate against them because of

12   the stay.  They have admitted, Your Honor, David Berge

13   admitted on multiple occasions in this case, and it's

14   stipulated to and admitted in his answer, that this was a

15   final judgment against him.  If it was final, it had to lose

16   all the claims that were pending against him at the time it

17   was entered.

18                    So, we think for that reason, Your Honor,

19   the Judgment does resolve our common law claims.  Those

20   claims, the necessary elements of those claims, are entitled

21   to preclusive effect and under the case law those claims

22   which include the intentional interference with business

23   relations and civil conspiracy –

24                    THE COURT:  Even though she didn't talk

25   about them.

1    MR. KROG: She didn't talk about them

2    specifically but the parts of the judgment that clearly don't

3    relate to the claims she mentioned by name relate to them.

4    And the record reflects that they were live and the judgment

5    is granting the motion for summary judgment. You know, the

6    claims had to go somewhere and she didn't dismiss them.

7                You know, and if she had simply put down

8    a one-line order, if we hadn't been asking for injunctive

9    relief, she'd just have put down a one-line order,

10   Plaintiff's motion for summary judgment is granted and the

11   clerk is directed to enter judgment according to Rule 58.  I

12   mean that would have had the same effect.  It would have

13   adjudicated it in MarketGraphics' favor, all the claims for

14   relief had been sought, and motion for summary judgment.  And

15   the basic irreducible elements of Defendant's common law

16   claims, Your Honor, intentional interference with business

17   relations and civil conspiracy would add any icing on the top

18   or additional findings because the (inaudible) because

19   intentional torts under Tennessee law entitle the Plaintiff

20   to judgment as a matter of law under 523(A)(6).  In regards

21   to at least the portion of the judgment that reflects damages

22   on them.  So the 72,328 element.

23               And we cited the case law in our

24   (inaudible), Your Honor, from the Trawmad Case, a Tennessee

25   Supreme Court case, on the element of the intentional

1  infliction, intentional interference with business relations.
2  We have cited the determinations from the Bankruptcy Court of
3  the Eastern District of Tennessee that that's a tort that's
4  not dischargeable under (inaudible) as well as analogous
5  determinations of other courts.
6              Something is true at least as to
7  willfulness, Your Honor, for the TCA judgment.  And there was
8  some confusion, previously at least.  I was confused, I doubt
9  that Mr. Lefkovitz or Your Honor was confused.  I was
10  confused perhaps as to the scope of the Court's judgment
11  ruling as to whether or now the TCPA judgment in Judge
12  Trauger's ruling conclusively established willfulness for
13  purposes like we're here today.  And I would submit to Your
14  Honor that it does and that to the extent that Your Honor
15  will otherwise, will be inclined to otherwise - that judgment
16  or that decision should be altered, if Your Honor should
17  conclude that the willful violation of TCPA is the same as
18  the willful infliction of injury.  And the reason for that is
19  that it's accepted that under the TCPA willful means
20  intentional.  And there's also this knowing standard, willful
21  or knowing, and knowing means with knowledge of the falsehood
22  or deceptiveness of statements you're making.
23              And under Tennessee law, when we say
24  intentional, we mean the same thing that the Supreme Court in
25  Geiger means, desire the results or know they're

1    substantially likely to occur.  In fact, the Court of Appeals

2    in the Mix versus Miller case, they're adopting to the same

3    restatement (inaudible) Section 8(A).  We also cite in our

4    brief the very recent Tennessee Supreme Court, Hughes versus

5    Metro, in which the Tennessee Supreme Court goes through the

6    same analysis, did this Metro employee commit an intentional

7    tort?  Did he admit negligence?  And look at, well, what

8    results did he intend?  If you intended a particular sort of

9    result, well that was an intentional tort.  And if you didn't

10   have any conception of the outcome, well that's just

11   negligence.

12            And so, Your Honor, the idea is that under the

13   TCPA the willful, which we know means intentional, that

14   doesn't count as willful 523(A)(6), Your Honor.  That's not

15   accurate.  And I think that one of the reasons that argument

16   comes up is, I'll be honest, (inaudible) Your Honor's

17   colleague in Knoxville got it wrong in the (inaudible) case.

18            Mr. Lefkovitz has argued that this

19   (inaudible) case was cited in the debtor's favor, which it

20   was, because the underlying judgment didn't demonstrate

21   malice.

22            I think it's probably clear from what

23   we've got highlighted here, that the underlying judgment,

24   willful violation of TCPA judgment didn't find that the

25   Bankruptcy Court concluded that that didn't mean willful

153

1   under 523(A)(6).  The state court's judgment finds that the

2   debtor intended to commit the acts that caused harm to the

3   plaintiffs.  And the court then correctly said that is not

4   the same as finding that the debtor intended (inaudible)

5   harm.  And the problem is that that first sentence is not the

6   law in Tennessee.  That is not what Tennessee law means by

7   willful or intentional.  When our Legislature uses that term

8   in a TCPA, they mean you intend the consequences.  And notice

9   that (inaudible) doesn't cite any authority for this

10  proposition, not for where it comes from.

11                  THE COURT:  Are you saying this case was

12  decided wrongly by the Bankruptcy Judge?

13                  MR. KROG:  To the extent that it turned –

14  I'm saying, Your Honor, that its interpretation of willful

15  under the TCPA is wrong.  In other respects, it is a very

16  well-reasoned opinion.  In this respect, apparently the –

17  whoever was representing the creditor in this case didn't

18  bother to give the Bankruptcy Court any insight into what

19  willful and intentional mean in Tennessee law, because I

20  can't explain otherwise why the Bankruptcy Judge, in an

21  otherwise well-reasoned and scholarly opinion, would make

22  this flagrant misstatement of Tennessee law.

23                  And so, to the extent that we're relying

24  on Crownover to conclude that the TCPA judgment isn't

25  conclusive as to willfulness, Your Honor.  I would encourage

154

1    Your Honor to respectfully disagree with the Bankruptcy Court

2    from the Eastern District of Tennessee because the statement

3    the Court makes isn't supported by Tennessee authority.

4                        Your Honor, Mr. David Berge participated

5    in this Realysis business.  He knew what he was doing.  He

6    very well might have participated in it at his father's

7    behest.  Your Honor does not have to believe any of the

8    things Mr. Don Berge said in District Court about David being

9    in charge, it being David's business, all I do is take the

10   mail and be the gopher.  Your Honor, (inaudible).  Frankly, I

11   don't think it's true.  We didn't think it was true then and

12   I don't really think it's true now.

13                       But Mr. David Berge was not simply a

14   complete outsider who didn't know what was going on.  He was

15   staying in his parents' house in October of 2012.  He saw his

16   father send out at least one letter to his client (inaudible)

17   in an attempt to dissuade them from continuing their

18   relationship with MarketGraphics.  He had a financial

19   interest in that happening.  He might have done it because he

20   wanted to help his father out; he might not bear any ill will

21   and this might have caused any ill will at that time towards

22   MarketGraphics, but that's not the test, Your Honor.

23                       The evidence, Your Honor, demonstrates

24   his participation was just as great, if not greater, than the

25   level of participation in wrongful undertakings in Bankruptcy

1   courts all across the country have found sufficient to be

2   willful and malicious under Section 523(A)(6).

3                In addition, we have here the fact that

4   Mr. Berge, at least to a certain extent, embraced the title

5   his father was giving him. He put it on Linked In that he

6   would be President. He didn't object at any time during the

7   District Court action or the pre-suit Realysis period to

8   being represented in this way. He went along with the

9   meetings with his father and the clients so that they could

10   get to know him better and someday maybe he could take over

11   the business. It just so happens, Your Honor, that the

12   business wasn't one that's lawful.

13                Under the circumstances, and the fact

14   that Mr. Berge might have thought it was okay doesn't make it

15   so. For that reason, Your Honor, we submit that the, request

16   that the Court enter the request declaration that the entire

17   amount of Plaintiff's judgment in the District Court be

18   declared non-dischargeable under 523(A)(6) of the Bankruptcy

19   Code and a judgment would be entered in the Plaintiff's

20   favor, accordingly.

21                MR. LEFKOVITZ: If Your Honor please,

22   Steve Lefkovitz for the Defendant. At the get go I want to

23   compliment Mr. Krog on probably one of the best prepared

24   cases I've seen in a dischargeability trial. There have

25   probably been thousands of them that I've tried before this

156

1    Court.  His level of preparation has been absolutely

2    outstanding and I want to compliment him on that.

3                    Let's talk about what we have in the

4    case.  We have 523(A)(6).  If you'll look at 523(A)(6), Your

5    Honor, you want to go back 18, 19 years when Geiger came

6    down.  Geiger dealt with a doctor who was sued for medical

7    mal and the Court said in Geiger it's not dischargeable.

8    Then we got to Markowitz, and I think the Court is well aware

9    that the Sixth Circuit said in Markowitz that it was the

10   intentional acts that you had to intend your ultimate

11   consequence.

12                   Now, my final questions when I examined

13   Mr. David Berge was had you know the non-compete was

14   enforceable would you have gone down this road.  He said

15   absolutely not.

16                   The question, and I think the proof is my

17   father told me (inaudible).  And the reason was that David

18   believed he was on safe ground.  And I don't think that is

19   any intent to cause injury under the facts of this case.

20                   When I did my pre-case workup with Mr.

21   David Berge to start this matter, I'll tell you the fact

22   situation.  I was concerned because I had read all this stuff

23   from the District Court and in looking at the file I thought

24   this case was the Ledford case.  I saw this as something

25   similar to cites in Ledford that Mr. Krog was going to come

157

1   in and argue that it was a partnership between David and
2   Donald, that Realysis was just not really an LLC, and that
3   because of Donald's wrongful conduct that we were going to
4   have imputed liability to David.  Now, that would have been a
5   very interesting case.
6                   But we're here under 523(A)(6) and the
7   scope of the discharge - and that case didn't get brought.
8   Mr. Donald Berge goes to Bankruptcy Court in Mississippi,
9   uncontested discharge.  That wouldn't have been the result
10  had I been the Bankruptcy Judge hearing the case but it
11  wasn't contested.
12                  Now we're here and Mr. Krog is saying,
13  well, we've got all these other claims that survived the
14  entry of the judgment.  We're here under 523(A)(6).  It's
15  either willful and malicious or it's not -
16                  THE COURT:  Maybe you have a position on
17  this.  My question was what she ruled on on the summary
18  judgment and he's saying she ruled on civil conspiracy and
19  ruled on intentional interference with a business
20  relationship.  What's your position on that?
21                  MR. LEFKOVITZ:  I think the order speaks
22  for itself.  I think she's only found - I think Your Honor
23  got it right in your September 30, 2014 ruling, and that was
24  that the order of Judge Trauger speaks for itself, and it
25  ruled what it ruled.  And we can't read more into that order

1   than what was there.  And if there were matters unresolved by
2   her order that the Plaintiff's attorney prepared, then they
3   had to be addressed today in part of the proof and raised as
4   issues to be held non-dischargeable in the case.
5                       We can't read more into the record than
6   what Judge Trauger's ruling was, and the Court only speaks
7   through its orders.  So, the order of Judge Trauger is what
8   it is.  And if there are unresolved matters from the District
9   Court, today was the day to bring them aboard.  And we have
10  heard no proof and they would have to be presented as proof
11  under 523(A)(6), and it comes back down to the willful and
12  malicious.
13                      If the Court finds that the young Mr.
14  Berge acted maliciously, which I say he did not, then they
15  have not met the conjunctive test under both parts of the
16  statute and the debt is discharged.  And I think that it
17  makes an interesting academic question but the scope of the
18  discharge is the scope of the discharge.  And we can't read
19  more into Judge Trauger's order than what she ruled.
20                      So, for that reason I submit that they
21  had the (inaudible) today to find both willful and malicious,
22  and if they didn't then the whole claim should discharge.
23                      Thank you.
24                      THE COURT:  Anything further you want to
25  say?

159

```
1                    MR. KROG:  Just one point, Your Honor -

2                    THE COURT:  Did you try the case at the

3   district below?  Were you there when summary judgment was

4   granted?  Just curious.

5                    MR. KROG:  Well, yes, Your Honor, but the

6   District Court didn't have a hearing on the summary judgment.

7   The Court held a hearing on the motion for preliminary

8   injunction, which I was present.  I actually heard my

9   unpleasant voice on a record of Mr. Donald Berge's

10  deposition, and I will admit to having drafted the summary

11  judgment papers and the entry of judgment papers.  And if I

12  ever find myself in this position again, maybe the judgment

13  that I (inaudible) will have a little bit more detail.

14                   Our point, Your Honor, is that it doesn't

15  matter how detailed that judgment was because (inaudible -

16  away from mic) final as to Mr. David Berge, and the Defendant

17  has admitted - (inaudible).  The judgment is a final judgment

18  (inaudible).

19                   (Inaudible - away from mic)  Mr. Berge

20  admitted in Paragraph 31, Defendant admits the allegations

21  contained in Paragraph 31 of the Complaint filed against

22  (inaudible).  They admitted that the judgment was final, Your

23  Honor.  And, of course, as Your Honor knows, and you can

24  admit statements of fact and statements of law in the

25  pleadings.  And Mr. Lefkovitz has still not identified any
```

1   legal authority for the proposition that Judge Trauger could

2   shuffle common law claims off into civil procedure limbo and

3   enter a final judgment against one but not all defendants in

4   the case.

5               THE COURT:  How do we know that she

6   didn't find it necessary to address those?  I mean how do we

7   not know that?  A lot of times I'll rule on one thing and not

8   on something else.

9               MR. KROG:  Your Honor, to the extent that

10  there are discrete claims in a case, if Your Honor –

11              THE COURT:  Apparently you were happy

12  with the final judgment.  I mean I would have been in

13  District Court if I had gotten this final judgment.

14              MR. KROG:  We were very pleased to get

15  that judgment, Your Honor.  And based on the documents that

16  we submitted to Judge Trauger, the motions that we've looked

17  at, and we can go back and look at the statement of

18  undisputed material facts if we wanted to.  Those are in the

19  record as exhibits here today from the motion for summary

20  judgment.  It was certainly our request that we obtain

21  judgment on these common law claims that we've discussed as

22  well.  It was our impression that we had obtained judgment on

23  those.  And because there was a final judgment, as I said,

24  Your Honor, there wasn't anything else that Judge Trauger

25  could do with them.  Now, if it had been summary

1   judgment – pardon me, a partial summary judgment.

2                          If she had entered an interlocutory

3   order, she could just –

4                          THE COURT:  Did you indicate to her that

5   you were reserving any of the other claims?

6                          MR. KROG:  No, Your Honor.  We had

7   certain claims that were asserted against Mr. Donald Berge

8   only, including the contract and the, it seems like

9   cybersquatting and consumer protection act claim for damages.

10  And then we had some claims that were being asserted against

11  everybody else.

12                         A number of those claims we expressly

13  abandoned, either in the summary judgment motion itself or, I

14  believe in one case, in the local rule 7.01 motion.  The

15  remaining claims remained pending and the Defendants have

16  stipulated to that.  If we would look at the stipulations

17  filed in this case, one of the stipulations is a list of the

18  claims that remained pending at the time of the judgment, at

19  the time of our motion for summary judgment.

20                         If Judge Trauger had done anything other

21  than certify that judgment as final then Mr. Lefkovitz would

22  have an argument that it didn't do anything that it doesn't

23  say in black and white on its face.  But because the judgment

24  –

25                         THE COURT:  Maybe she erred.  Did

1  you tell her that she might have made a mistake or did

2  anybody tell her that she might have made a mistake or did

3  anybody tell her there's some claims that you didn't address?

4                    MR. KROG:  Well, Your Honor –

5                    THE COURT:  Maybe she thought that was

6  just enough.

7                    MR. KROG:  Well, Your Honor, the order

8  grants the motion and it says that the Plaintiff has

9  prevailed.  So –

10                   THE COURT:  If I grant a judgment on – it

11 seems to me I've written many, many opinions saying it's

12 unnecessary to address the rest of the stuff because I've

13 already found for the Plaintiffs or –

14                   MR. KROG:  Well, Your Honor would

15 certainly do that and I'm sure Your Honor does it all the

16 time in regards to alternative arguments for one claim.  So,

17 for here today we could have multiple reasons why we should

18 win our claim under 523(A)(6) and Your Honor can say, well, I

19 think the first reason is good enough, I'm not even going to

20 talk about these other reasons because they get us to the

21 same place.  But claims in a suit are not analogous to

22 multiple paths to the same conclusion, because each claim is

23 its own thing so to speak, to use a very imprecise term.  And

24 each claim has to be resolved one way or another before a

25 final judgment can be entered.

1               And I think the only way that Your Honor

2   could conclude that Judge Trauger's judgment didn't resolve

3   the common law claims, despite being final –

4               THE COURT:  Despite her saying it was

5   final.

6               MR. KROG:  Despite the Defendant's

7   admission in his answer that it's final.  We would have to

8   presume that Judge Trauger had erred, and of course, we never

9   presume errors on the parts of courts.  When you go up for

10  appeal you have to demonstrate error.  Appellate courts say

11  we're not going to just, you know, presume that somebody did

12  something wrong.

13             THE COURT:  Well, at best, it's

14  ambiguous, isn't it?

15             MR. KROG:  I think it would be ambiguous,

16  Your Honor, in isolation.  If all you had was the judgment

17  and that was the only thing in the record then, no, you

18  wouldn't be able to conclude from the face of the judgment

19  itself that there were these other claims in the case and

20  they've been decided in the Plaintiff's favor.

21             But as we saw from the pieces that we

22  mentioned, Your Honor, that's not the extent of the Court's

23  collateral estoppel analysis.  The Court is supposed to look

24  at the whole record, up to the whole record, to see what was

25  at issue in the case.

1    In the Miller versus Nichols Sixth
2 Circuit said very plainly, that is not the law.
3          THE COURT:  Couldn't she just as easily
4 have, I mean rather than say she made a finding that David
5 was liable, couldn't she have just as easily, since she
6 didn't mention it, conclude that the burden wasn't met on
7 those?
8          MR. KROG:  Well, Your Honor, it is a
9 (inaudible) world in which Judge Trauger could conclude that.
10 But it is not the world in which this judgment was entered
11 because there's nothing in the judgment that says the
12 Plaintiff hasn't carried its burden on any claim.
13          THE COURT:  Is there anything in the
14 judgment to say you've carried your burden on any claim?
15          MR. KROG:  Well, Your Honor, that the
16 judgment was being entered, that it was being entered in
17 response to the motion requesting judgment on a number of
18 claims and –
19          THE COURT:  And she talked specifically
20 about a few of them and she doesn't mention the others.
21          MR. KROG:  Not by name.  But as we saw,
22 there are parts of that judgment that don't relate to, in a
23 large swath, they don't relate to the TCPA or the copyright.
24 All the claims about Mr. David Berge and entities being
25 enjoined from further use of the MarketGraphics system and

165

competition with MarketGraphics in Memphis, enjoining them

from continuing to engage in market research, none of that is

relief under the TCPA or the copyright act.

The only thing that Judge Trauger could

have enjoined Mr. Berge from doing under the TCPA would have

been to stop engaging in unfair and deceptive acts.  And if

we go back and we look at the record, the unfair and

deceptive acts for which she was holding Mr. Berge

responsible was actually the sending of these blank

verification letters from October 30, 31 and November 9.

Those are what's referred to in the statement of undisputed

and material facts.

So, there's the large (inaudible) of

judgment dealing with the competitive behavior.  Those don't

relate to the TCPA or the copyright.  Those, Your Honor,

evidence that, if nothing else, that she's deciding these

other claims related to conspiracy, interference and unfair

competition in the Plaintiff's favor.  And, Your Honor, you

can have an order that just says a motion is granted and

grants everything that was requested.  I can't conceive, and

Mr. Lefkovitz hasn't pointed the Court to any example where a

court enters an order that says here's all this relief and

then -

THE COURT:  Maybe she concluded the

damages would be the same no matter what, so she didn't need

1  to address them.  I don't know.  I can't go behind what she's

2  done here.

3              MR. KROG:  And I think the way to untie

4  that Gordian knot, Your Honor, is Rule 58(B) certification.

5  But she just didn't have the freedom to leave them hanging.

6              Now, the damages on these common law

7  claims were – did overlap and they were the same damages, the

8  same $72,328.  And so if those were simply multiple theories

9  – for our purposes here, just as an example, Your Honor could

10  conclude that we had shown non-dischargeability on any one of

11  those common law claims or under the TCPA, and not on the

12  other common law claims, and dismiss our claims for the ones

13  we hadn't proven, and we would wind up with the same debt.

14  But in that case – and even in that case, because –

15              THE COURT:  I don't need to go there

16  because if I agreed with you on the others, the ones she had

17  explicitly ruled on, if I agreed with you on those, that's

18  enough for (inaudible).

19              MR. KROG:  I think that would probably be

20  enough for (inaudible), Your Honor.  The only issue is

21  whether or not those were discrete claims in the District

22  Court that could be left hanging.  And I think the case law,

23  and if Your Honor would like me to submit an additional brief

24  on just this topic, I will be happy to do it.

25              THE COURT:  I think we've got

1  enough paper.

2                          MR. KROG:  I agree with that.  And I

3  apologize for as much paper as we have but I think this is

4  probably –

5                          THE COURT:  I've taken to using one of

6  these so we don't kill all the trees.

7                          MR. KROG:  I wasn't confident that I

8  would be able to navigate everything on my computer so we

9  brought the paper, Your Honor.  Maybe in the future we'll try

10  to do it just on the screen.

11                          THE COURT:  I'm going to have to think

12  about that.  I mean I'm going to have to re-read her opinion

13  and make my own decision about that.

14                          MR. KROG:  And, you know, Your Honor,

15  (inaudible) but there was no paragraph in that judgment that

16  says, you know, the Plaintiff is hereby awarded judgment on –

17                          THE COURT:  Each and every claim stated

18  by –

19                          MR. KROG:  Each and every claim

20  requested.  And the notion, the principle is simply, if we

21  look at Rule 7.01 motion, if we look at the motion for

22  summary judgment, and we look at the committed fact that the

23  final judgment as to Mr. Berge and it's not final to other

24  parties in the case, that (inaudible) all the claims that

25  remain pending against him.  There is simply nothing else

                                                                168

1  that it could have done.  If the minor premise is there are

2  other parties still in the case and the major premise is the

3  judgment is final as to Donald Berge, then the conclusion as

4  a very basic syllogism is the judgment adjudicates all

5  remaining claims as to David Berge.

6                      THE COURT:  Thank you.

7                      MR. KROG:  Thank you, Your Honor.

8                      THE COURT:  Mr. Lefkovitz, do you want to

9  say anything about that?

10                      MR. LEFKOVITZ:  No, Your Honor, I think

11 I've said enough today.

12                      THE COURT:  Well, we'll be back in touch

13 with you in the next week or so, probably for oral opinion.

14                      MR. LEFKOVITZ:  Thank you, Your Honor.

15                      THE COURT:  We'll be adjourned.

16                      (Proceedings concluded at 2:52p)

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

2   STATE OF TENNESSEE,

3   COUNTY OF DAVIDSON, to-wit:

4                 I, Ann Woofter, hereby certify that I have

5   taken down and transcribed the foregoing testimony of

6   Lawrence Weitz, Ph.D., to the best of my skill and ability.

7                 I further certify that I am not related by

8   blood or marriage to any of the parties to this cause and

9   that I have no interest, one way or the other, in the outcome

10   of said cause.

11              Given under my hand this 12th day of May 2016.

12

13

14              _____

15              Ann Woofter, Certified Court Reporter

16              TN Board of Court Reporting Lic. #290

17              Notary Public, State of Tennessee

18              My commission expires May 20, 2014

19

20

21

Case 3:16-cv-01191   Document 14   Filed 11/01/16   Page 170 of 170 PageID #: 1905